**William T. BRODERICK and Boston Police Superior Officers Federation, Plaintiffs,**

v.

**Francis M. ROACHE, James Hart, Paul Evans, Arthur Morgan, Robert Conlon, Charles Burke, and the City of Boston, Defendants.**

**Civ. A. No. 90–11500–MA.**

United States District Court, D. Massachusetts.

June 18, 1991.

James F. Lamond and Alan J. McDonald, McDonald, Noonan & Kaplan, Newton, Mass., for plaintiffs.

Paul J. Gillespie, Driscoll, Gillespie and Stanton, Lynnfield, Mass., James A. Brett, Reed, O'Reilly & Brett, Nancy Merrick, Merrick & Louison, Walter B. Prince, Rosanna Cavallaro, Peckham, Lobel, Casey, Prince & Tye, Peter Antell, Antell & Blacker, John P. Roache, Sullivan, McDermott & Hogan, Michael C. Bolden, City of Boston Law Dept., Asst. Corp. Counsel, and Kevin S. McDermott, Boston Police Dept. Corp. Counsel, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This is a case filed by the Boston Police Superior Officers Federation ("Federation") and William T. Broderick ("Broderick"), the Federation's president, against the City of Boston ("City") and various officials employed by the Boston Police Department ("BPD").[1] The Federation is the union which represents all uniformed personnel of the BPD employed in the positions of sergeant, lieutenant, and captain.[2] In a detailed verified complaint, Broderick alleges various constitutional and statutory causes of action against the various defendants and seeks declaratory, injunctive and compensatory relief. The complaint

charges that the defendants engaged in a pattern of harassment and retaliation against Broderick, impermissibly designed to punish and chill his exercise of constitutionally protected rights to speak on matters of public concern, to participate in union activities, and to file actions in courts. Broderick demands relief from all of the defendants pursuant to 42 U.S.C. § 1983 ("section 1983"), and the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I. He also alleges a civil conspiracy by the BPD defendants to deprive Broderick personally of his constitutional and statutory rights. Jurisdiction for the federal claims is based upon 28 U.S.C. § 1343(a)(3). Pendent jurisdiction is invoked for the state-law claims.[3]

In a memorandum and order dated November 21, 1990, this court ordered that the parties first address the issue of whether the plaintiff's conduct was, as claimed, constitutionally protected.[4] Discovery was stayed except to the extent necessary to address this threshold issue. *Broderick v. Roache*, 751 F.Supp. 290 (D.Mass.1990).[5]

In accordance with the court's ruling, the plaintiffs have now filed a motion for partial summary judgment on the issue of

---

1. The "BPD defendants", as they will be referred to collectively herein, are Francis M. Roache, the Police Commissioner, James Hart, the Legal and Administrative Advisor, Paul Evans, the Superintendent in Chief of the Bureau of Field Service, Arthur Morgan, the Deputy Superintendent of the Internal Affairs Division, Robert Conlon, a Sergeant Detective in the Internal Affairs Division, and Charles Burke, the Deputy Director, of the Bureau of Administrative Services. All of the BPD defendants were sued in both their individual and official capacities.

2. All of the counts except Count Five, the civil conspiracy charge, name both Broderick and the Federation as plaintiffs. For ease of reference, the plaintiffs will be referred to collectively herein as "Broderick" when the reference is to their capacity as plaintiffs in this action.

3. It is unclear whether Count Five of the complaint, charging a "civil conspiracy" to "use unlawful means to harass, punish, and retaliate against Broderick for having exercised his constitutional and statutory rights" is intended to state a claim based upon the common law of torts, or a civil rights conspiracy based upon 42 U.S.C. § 1985. In my previous memorandum and order I assumed the latter; however, upon

reflection the tort claim seems equally plausible. This issue, not having been briefed by the parties, need not be resolved at this juncture.

4. Essentially, this court ruled that *Connick* precluded a section 1983 claim based upon claimed retaliation for union activities, and that the parties should focus their summary judgment submissions on whether statements by Broderick concerned matters of public interest.

5. The November 21, 1990 memorandum and order also ruled that a factually related civil RICO claim, Count Four of the complaint, failed to state a claim and dismissed that claim against the moving party, Paul Evans. *Broderick*, 751 F.Supp. at 294–95. Because the same legal deficiency applied equally to the claim against all of the named defendants, Count Four has been dismissed against each defendant upon motion. In separate proceedings, the plaintiff's motion to amend the complaint to add a new factual allegation was allowed on the papers. A motion to dismiss the case against the City pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative to dismiss the Federation as a party was also denied. *Broderick v. Boston*, 755 F.Supp. 482 (D.Mass.1991).

whether any of Broderick's statements were of public concern, and thus afforded special protection.[6]

■ In determining whether a public employer has impermissibly punished an employee for his exercise of his constitutionally protected right of free expression, the court must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). As a threshold matter, however, the court must determine if the speech was, as claimed, on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983).

■ Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Because the question of whether the speech is protected is a matter of law, and not fact, it can be resolved on the record as a preliminary question at summary judgment. *See Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. Accordingly, this memorandum will examine whether any of Broderick's speech was protected such that this cause of action is viable.

## I. The Factual Allegations

The relevant facts are essentially undisputed. All of the statements at issue are ones made "on the record" to the media, and thus are readily examined. For purposes of this motion, the detailed factual allegations of the verified complaint have been supplemented by Broderick's affidavit, with the statements at issue, and some background material, appended. The transcript of a deposition of Broderick has also been submitted by the defendants.[7] Because the particulars are crucial to the resolution of this motion, Broderick's statements as well as their context will be described in some detail, with summaries or generalizations where feasible.

The first series of statements were made in the months following the murder of BPD officer Sherman Griffiths during the execution of a "no knock" search warrant at a suspected drug distribution site. The record reflects that in the wake of the Griffiths murder, the media were exploring allegations of police misconduct raised by the investigation and prosecution of the murder.[8]

Several of the media pieces present broad ranging inquiries into the possible causes of internal BPD problems. Broderick's contributions range over a number of issues, including the role of politics in the making of personnel decisions in the BPD, and the training, supervision, and overall competence of the department.

In a local television news report broadcast March 15, 1989, the discussion revolved around the questions raised by the revelations of police misconduct concerning the quality of the BPD, its leadership, and

6. A motion for summary judgment filed by defendant Paul Evans before the issuance of the November 21, 1990 opinion also requested a ruling on this issue, among others. That brief was then supplemented in light of the court's opinion, and the other defendants have jointly and singly briefed the issues as well.

7. The plaintiff has filed a statement of undisputed facts in accordance with LR. 56.1. The statement filed by defendant Paul Evans in his September, 1990 motion for summary judgment does not contradict the essentials of the plaintiff's statement. None of the oppositions filed has controverted this statement, except perhaps to the extent that the final paragraph of Broderick's statement sets forth Broderick's motivation. Thus, the facts therein will be taken as true for the purposes of this motion. *See* LR. 56.1. The relevance of Broderick's motivation to the determination of whether his conduct is protected will be discussed in some detail later in this memorandum and order.

8. The submissions include a series of articles from this time period which do not refer to Broderick but which serve to illustrate the continuing focus of the media on the turmoil in the BPD after the Griffiths murder and Lewin prosecution. *See* Attachments F through K to Broderick Affidavit.

its future performance. Broderick made two contributions to the discussion:

"Well, I'd say at this point the morale in the Department is rock bottom. Of course, I've said that before, but there always seems to be something else that comes along and makes it worse."

"The individuals that are in the Department now, as I say, the 'Career' officers, they see no upward mobility unless they can get a job driving the mayor around, so to speak. Some sort of political position and work their way up that way. The Department is crumbling. It's crumbling all around them."

Jack Harper, *Boston Police: Trouble Within? A Special Checkpoint Report*, Channel 5 interview broadcast March 15, 1989. Tr. at 1, 4. Attachment A to Broderick Affidavit.

In a radio news broadcast on the same day, Broderick again criticized the BPD, charging that officers received inadequate training and were poorly supervised by their superiors. Broderick attributed the supervisory problems to the fact that immediate supervisors were being constantly overruled by Deputy Superintendents and were accordingly and detrimentally cautious about making any independent decisions. *The Rules of the Law: A Special Report by Andrea Carneiro*, WEEI Radio News, broadcast March 15, 1989. Attachment B to Broderick Affidavit.

Another article printed several weeks later examines allegations that political influence on the command structure of the BPD has increased during the Flynn administration. The article explores whether this tightened political control is a positive or negative trend in the development of the police force. The reporter characterizes Broderick's contributions to the debate as follows:

To those like Sgt. William Broderick, president of the 230 member Boston Police Superior Officers Federation, politics means meddlesome and mean-spirited interference by City Hall. Merit, he says, has gone out of the window, and growing City Hall influence encourages police officers 'to not make waves.'

"The problem with this administration," complains Broderick, "is that they equate disagreement with disloyalty."

.        .        .        .        .

Broderick's group, now the most combative of the unions, is trying to settle a contract with the city. In the meantime, its members are feeling the pinch: two of its representatives got transferred this week.

"What does this mean to the average citizen?" Broderick says, repeating the question. "It affects morale. It makes the officer look the other way. It creates an 'I don't want to get involved' attitude. And you can't have that in police work."

*Politics playing larger role in police matters, many say*, Boston Globe, April 11, 1989. Attachment E to Broderick Affidavit.

The final broadly focussed article from that period is a June, 1989 *Boston Magazine* article entitled "Who's in Charge Here?", which examines the problems and role of politics in the Roache BPD. Broderick is quoted as saying that City Hall, and politics, are the moving forces behind all BPD appointments. He also attributes certain demotions and transfers within the BPD to politically motivated retribution. He charges that the BPD retaliates against officers who take a stand perceived to be at odds with the BPD's interests. The article refers to a long term "mutual animosity" between Broderick and Roache and recounts possible causes and fuel for their supposed feud.

Other articles are less reflective of any broad issues and simply chronicle the personnel and personality disputes which occurred during that time period. One group of articles reports upon the transfer of a number of BPD officers. In one article, Broderick charges that at least two of twenty transfers were politically motivated, stemming from BPD embarrassment after Griffiths' murder. In another, Broderick reports that his union will appeal the allegedly illegal transfers. *Union blames transfer on Griffiths case*, Boston Globe, April 10, 1989; *Flynn, Roache defend po-*

*lice staffing stunner*, Boston Herald, April 10, 1989, Attachments C and D to Broderick Affidavit.

A separate series of four articles published in the local newspapers in December, 1989, pertains to the state's request that the BPD hold a qualifying examination for the civil service rank of captain. According to the articles, such an examination had not been held in the BPD for fifteen years. Broderick is quoted as saying that avoiding holding a captain's exam is part of an attempt by the mayor to maintain political control over the BPD by appointing provisional captains rather than promoting civil service candidates. Broderick relates this practice to poor performance of the BPD on the streets of the city. Broderick urges the immediate scheduling of an exam and urges the BPD to use the state captain's exam rather than attempting the costly option of devising their own. Attachments M through P.

A final group of articles focus on a controversy arising out of the disciplinary suspension of a black BPD sergeant and Federation member, Robert Orr, in 1988. In articles detailing the subsequent reversal of Orr's suspension and the filing by the Federation of an internal affairs complaint and civil rights suit on behalf of Orr against a high ranking BPD official and a police prosecutor, Broderick charged that racial bias and perjury as well as violations of BPD procedures amounting to due process violations were committed during the suspension proceedings. A Boston Globe article dated April 23, 1989, quotes Broderick as saying the evidence of department prosecutor misconduct shows "serious problems in the department." Attachment S to Broderick Affidavit. Another article discloses a letter from Broderick to Commissioner Roache, in which Broderick charged the police prosecutor with "an outrageous criminal act by a police prosecutor committed in the furtherance of the violation (of) a black police sergeant's civil rights" and demanded that both officials be fired. *Cop boss says police lawyer lied about probe*, Boston Herald, Dec. 7, 1989. Attachment Q to Broderick Affidavit. A Boston Herald article of January 4, 1990,

entitled "Suspended union chief blasts cop prosecutors", describes how Broderick held a press conference calling for the indictment of three BPD internal prosecutors just hours after he was suspended for "poor judgment." The article reports that the BPD administration charged that the press conference was held in retaliation for the suspension. Attachment T to Broderick Affidavit.

Lastly, Broderick publicly criticized a BPD policy to reduce the use of overtime, claiming that the reduction endangered the public because it left patrolmen inadequately supervised in some areas of the city. *Cop union boss: OT ban may imperil public safety*, Boston Herald, Feb. 22, 1990. Attachment U to Broderick Affidavit.

## II.  *Are these statements protected?*

After a careful review of this record, I conclude that Broderick has met his threshold burden of establishing protected conduct. Although some of his speech can be characterized as personal, either as evidence of his ongoing dispute with the police commissioner and city hall or as an outgrowth of essentially private union-employer maneuvers, some of his speech is clearly of sufficient interest to the general public to be worthy of constitutional protection from unfair employer retaliation.

This case highlights several of the reasons why the "public concern" limitation of first amendment protection in the public employment context has caused the courts some perplexity since the standard was delineated in *Connick*. It is inescapable that the distinction between private and public grievances is often blurred, particularly where, as in this situation, the public employer is one crucial to public safety. The delivery of police services to a large city is unavoidably of interest to its citizenry, especially during a time of heightened scrutiny of that employer caused by a series of scandals as in this case. The record reflects that Broderick's statements were made amid dual concerns: the public attention focused on obvious

problems of the police force as revealed by the Griffiths murder case, and an ongoing conflict between Broderick, the Federation and the BPD over various employment issues, such as contract disputes, personnel promotion and transfer policies, and overtime policy. The context is further complicated by the involvement of the plaintiff union, the Federation. Although primarily an association for private employment purposes, the Federation may, through Broderick or otherwise, represent the civic interests of its members as well. Free speech interests, and perhaps associational interests, are at stake for the plaintiff Federation as well as for Broderick.[9] It is necessary to discern the extent to which the Federation is asserting its private, economic interests as an association of employees, which are not protected in this section 1983 action, and the extent to which it asserts its right to contribute to the public debate about the BPD as an association, a right to free expression safeguarded by section 1983 from employer retaliation and harassment.

In spite of the ambiguities and competing interests implicated by this background, I have concluded for the following reasons that at least some portion of Broderick's conduct is protected.

Broderick's statements were made to the media and thus addressed a public audience. In fact, the undisputed evidence in the record indicates that Broderick's comments were frequently solicited by the press. See Broderick Affidavit. Admittedly, the fact that the media runs a story does not make it a matter of public concern automatically, but the repeated printing of the stories, often by both major local newspapers on the same day, is evidence of the ongoing public interest in these issues. The frequency of articles on the BPD, and Broderick's regular contribution to them which is clearly established by the record, is persuasive. Gomez v. Texas Dep't of Mental Health, 794 F.2d 1018, 1021–22 (5th Cir.1986) (whether employee tried to communicate outside institution and whether people outside the workplace were debating the subject of the speech are relevant factors in assessing whether the matter is one of public concern).

These factors clearly point toward finding at least some of Broderick's statements protected. However, I am given pause by the fact that the news pieces described in the complaint and submitted by the plaintiffs reveal that Broderick is continuously motivated by the desire to further the interests of the Federation, often at the expense of the BPD, Commissioner Roache,

9. In Count One, Broderick alleges that not just speech, but also constitutionally protected rights to associate with the union, participate in its activities, and obtain access to courts are implicated. Although not explicitly detailed in this court's memorandum and order of November 21, 1990, clearly implicit in the holding is that associational interests should be analyzed under the same standard set forth in Connick. I reached that conclusion based upon several factors. First, although Connick is a speech case, I see nothing in the opinion which suggests that the Court intended to limit its holding to the expressive aspect of the first amendment freedoms. Connick is the outgrowth of a series of cases, including Pickering, which address associational as well as expressive first amendment interests. Connick itself, although essentially a speech case, contains associational overtones. The plaintiff is dismissed after circulating a questionnaire about office concerns among her coworkers. Furthermore, I see no basis in the substantive law which affords freedom of association a higher level of protection than the right of free speech. As for the

claimed violation of the right to petition, presumably also intended to be raised by Broderick in his charge that he was being retaliated against for filing actions in court, I can only say that Broderick's claim is not based upon the usual understanding of that first amendment right.

Several courts have interpreted the law differently, however. See, e.g., Stellmaker v. De Petrillo, 710 F.Supp. 891, 892–93 (D.Conn.1989) (plaintiff discharged for prosecuting a collective bargaining grievance against public employer had a section 1983 claim based on first amendment rights of association and petition not subject to Connick public concern inquiry) (citing cases); Hatcher v. Board of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir.1987) (union activities protected by section 1983 and not subject to Connick hierarchy); Saye v. Saint Vrain Valley School Dist., 785 F.2d 862, 867 & n. 1 (10th Cir.1986) (same). At least one district court judge in Massachusetts also reached this outcome. See Gavrilles v. O'Connor, 579 F.Supp. 301, 304 (D.Mass.1984); 611 F.Supp. 210 (D.Mass.1985).

and the City. The record clearly indicates that the content of Broderick's speech can be at best characterized as a mix of personal and public. To some extent, the record read as a whole reflects a systematic exploitation by Broderick of public concern about the problems of the BPD to provide a forum for union and personal gripes against the BPD and City leadership. The media is a powerful tool in influencing opinions and winning disputes in disputes between a public employer and public employees. Yet regardless of any self interested motivation, Broderick's statements to the press are contributing to the public debate, whatever his personal agenda may be.

However, motive is only one factor relevant in the *Connick* analysis. *Kinsey v. Salado Indep. School Dist.*, 916 F.2d 273, 279 (5th Cir.1990); *Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). In *Connick*, motive was clearly a factor considered by the Court, but it was not dispositive, because although the Court founds that Connick's motive was to further her own dispute with the District Attorney over the unwanted transfer, one of her questions, querying whether employees felt pressured to work on political campaigns, was nevertheless found protected. *Zamboni*, 847 F.2d at 78. Especially where the speaker identifies policy issues as well as a personal complaint, "motivation is 'merely one factor to be considered, but not necessarily controlling, in assessing the character of [the employee's] speech.'" *Id.* at 78, quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir.1988).

Thus, even if motive may to a great extent fuel Broderick's willingness to speak to the press, he still contributes to the public debate over issues of general concern. Individual grievances serve as illustrations of general problems. Broderick does frequently relate employee concerns to public concerns, in an interesting way. And, Broderick has an audience for his complaints, however acrimonious, because the public wants information about why the BPD has so many problems.

In view of the fact that at least some of the plaintiff's factual allegations state a claim, final resolution of the issue of whether the plaintiff has an independent claim based upon rights of association or petition is unnecessary. In the interest of a most fair and complete resolution of the dispute between the parties, these issues should not be excluded now that it is clear that the case will proceed to a resolution upon the merits. The parties are therefore instructed that the factual allegations excluded by the November 21, 1990, order may be presented as part of the evidence at trial.

Having reached this conclusion, this case takes on a very different complexion. It is now ready for final discovery and trial. Discovery is to be completed within six months of this date and is to focus on the issues as defined in all memoranda and the precise role of all participants in those issues. Discovery will not be permitted to be an opportunity to further exacerbate the tensions between the two sides, but will be a careful, factual inquiry into the defendants' motivations and reasons in their activities, as well as the plaintiffs' motivations and reasons for bringing this lawsuit.

In accordance with the foregoing, on the issue of public concern, the plaintiff's motion for partial summary judgment is granted, and the various defendants' motion for summary judgment are denied.

SO ORDERED.