**William T. BRODERICK and Boston Police Superior Officers Federation, Plaintiffs,**

v.

**Francis M. ROACHE, et al., Defendants.**

**Civ. A. No. 90–11500–MA.**

United States District Court, D. Massachusetts.

Oct. 6, 1992.

James F. Lamond, Alan J. McDonald, Newton, Mass., for plaintiffs.

Paul J. Gillespie, Driscoll, Gillespie and Stanton, Lynnfield, Mass., for Francis M. Roache.

James A. Brett, Reed, O'Reilly & Brett, Boston, Mass., for James Hart.

Nancy Merrick, Merrick & Louison, Boston, Mass., for Paul Evans.

Walter B. Prince, Rosanna Cavallaro, Peckham, Lobel, Casey, Prince & Tye, Boston, Mass., for Arthur Morgan, Jr.

Peter Antell, Antell & Blacker, Boston, Mass., for Robert Conlon.

John P. Roache, Hogan & Roache, Boston, Mass., for Charles Burke.

Michael C. Bolden, U.S. Atty.'s Office, Kevin S. McDermott, William H. Keefe, Asst. Corp. Counsel, City of Boston Law Dept., Boston, Mass., for City of Boston.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This civil rights case was filed by the Boston Police Superior Officers Federation ("Federation") and William T. Broderick, the Federation's president, against the City of Boston and officials of the Boston Police Department ("BPD"). The complaint alleges that the defendants engaged in a pattern of harassment and retaliation designed to punish and chill Broderick's exercise of his constitutionally protected rights to speak on matters of public concern, to participate in union activities, and to file actions in court. Broderick and the Federation bring suit pursuant to section 1983, 42 U.S.C. § 1983, and the Massachusetts Civil Rights Act ("MCRA"), Mass.Gen.L. ch. 12 §§ 11H and I. Broderick also alleges a civil conspiracy by the defendants to deprive him of his constitutional and statutory rights. This case is presently before the court on the defendant City of Boston's Motion for Summary Judgment on Count Two, which alleges that the City is liable under MCRA.[1]

### I. Standard for Summary Judgment

Summary judgment is warranted only when the record, viewed in the light most favorable to the non-moving party, evinces no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). While a court need not "give credence to 'mere allegations' or draw inferences where they are implausible or not supported by 'specific facts,'" Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir.1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), the court must "take the record in the light most hospitable to the party opposing summary judgment and indulge all reasonable inferences favorable to him." Buenrostro v. Collazo, 973 F.2d 39, 41 (1st Cir.1992).

### II. Facts Alleged

William Broderick has been employed by the BPD since 1969 (as a police officer since 1977 and as a sergeant since 1986). He has served as president of the Federation since January 1, 1989. Prior to that date he held the position of vice president of the Federation, to which he was elected in November 1987. The Federation is the collective bargaining representative of all uniformed personnel of the BPD employed in the positions of sergeant, lieutenant, and captain.

In his complaint, Broderick alleges that he has been the target of a campaign of

---

1. In a previous memorandum, issued on November 21, 1990, this court dismissed Count Four (liability under RICO) as to the defendant Paul Evans and stayed discovery except as to the issue of whether Broderick's conduct was, as claimed, constitutionally protected. See Broderick v. Roache, 751 F.Supp. 290 (D.Mass.1990). A subsequent memorandum, issued January 28, 1991, denied the defendant City of Boston's motion to dismiss the plaintiff Federation. See Broderick v. City of Boston, 755 F.Supp. 482 (D.Mass.1991). A memorandum issued June 18, 1991, 767 F.Supp. 20, resolved the question of whether Broderick's statements were of public concern, and thus protected, in his favor. The present memorandum and the companion memorandum on the motion for summary judgment by defendant Arthur Morgan should result in the issues being more clearly delineated for trial as to the remaining defendants.

harassment and retaliation by the defendants because he has been active on behalf of the Federation and because he has frequently criticized the BPD and Police Commissioner Roache in the news media. Broderick claims that the defendants have retaliated against him by denying him a promotion to which he was entitled, by refusing to grant him permission to practice law in his off-duty hours, and by subjecting him to unjustified disciplinary proceedings. A condensed version of the events which allegedly triggered this retaliation follows.

Broderick's disagreements with the BPD date from 1987, when, as a member of the Federation's Promotions Committee, Broderick publicized his criticism of an examination used to promote officers to the position of lieutenant. The exam had been devised by the Massachusetts Department of Personnel Administration ("DPA"). The Federation sued DPA and the Police Commissioner over the content and structure of the exam, and as a result "DPA revised the examination in a manner supported by the [Federation] but opposed by the BPD." Verified Complaint, ¶ 13(a).

The exam was given in the late spring and summer of 1987, and Broderick sat for it. Plaintiffs' Trial Document, ¶ 17. Because of problems with the administration of a portion of the exam, there was a controversy over whether the exam should be invalidated. Broderick, in his capacity as vice president of the Federation, "openly opposed the position taken by the BPD in the presence of high level BPD representatives." Plaintiffs' Trial Document, ¶ 19.

DPA ultimately denied the BPD's request to readminister the exam and proceeded to rank the candidates for promotion on the basis of the remaining untainted exam components, as urged by the Federation. Broderick was twenty-fourth out of 111 candidates. In March 1988, Police Commissioner Roache promoted the twenty-three sergeants ranked above Broderick and the ten sergeants immediately below Broderick to lieutenant. Plaintiffs allege that Roache had never previously deviated from the rankings in making promotions. See Plaintiffs' Trial Document, ¶ 21.

In March 1988, Broderick and the Federation brought suit against the BPD for the decision to bypass Broderick for promotion. The Superior Court ordered the BPD to leave vacant a lieutenant's position pending a Civil Service Commission investigation. The BPD ignored that order and proceeded to fill the vacancy. The Superior Court held Police Commissioner Roache and the BPD in contempt of court. Broderick and the Federation then called for Roache's resignation in correspondence sent to Roache and to Raymond Flynn, Mayor of Boston.

Sometime during March, Broderick was "verbally harassed" by James Hart, the BPD Legal and Administrative Advisor, at a BPD swearing-in ceremony. Broderick claims that "Hart intended to intimidate him in connection with the [Federation's] challenge to Broderick's having been bypassed for promotion." Verified Complaint, ¶ 18.

Meanwhile, Broderick had been sworn in as a member of the Massachusetts bar in December 1987. In January 1988, Broderick requested permission from Commissioner Roache to engage in the private practice of law during his off-duty hours. The BPD has a long-standing policy of granting such requests and at the time Broderick sought approval, approximately thirteen other officers had been granted permission to practice law on a part-time basis. Permission had been granted to one officer as recently as October 1987. In fact, plaintiffs state, permission had never previously been denied and was usually granted within two weeks of the time of the request. However, Broderick was told that his request was being held up pending a review and possible revision of the policy. Broderick was not granted permission until December 1990, after he filed a prohibited practice charge with the Labor Relations Commission. See Plaintiffs' Trial Document, ¶ 25.

During 1988 and 1989 Broderick had numerous further disagreements with the City and the BPD. In November 1988, Broderick became the Federation's chief representative in negotiations with the City

over a new collective bargaining agreement. The parties were unable to agree on the terms of the agreement and filed for binding arbitration. The arbitrator ruled in favor of the Federation on the issue of the right of Federation officers not to be transferred by the BPD while in Federation office. When the BPD announced the transfers of two Federation officers in defiance of the arbitrator's ruling, the Federation sued for an injunction in Superior Court, where the arbitrator's ruling was confirmed. *See* Verified Complaint, ¶ 13(d), (e). This incident, including Broderick's criticism of the City, was widely publicized.

In March 1989, Broderick wrote to Commissioner Roache to complain that Charles Burke, Deputy Director of the Bureau of Administrative Services, was having Broderick followed in an attempt to prevent him from speaking to the media. An internal investigation subsequently found Broderick's complaint against Burke to be unsubstantiated. The *Boston Herald* covered the story. *See* Plaintiffs' Trial Document, ¶¶ 38, 39.

Also in March 1989, following the shooting death of BPD officer Sherman Griffiths, Broderick publicly criticized BPD policies regarding search warrants and drug investigations and the effects of those policies on police morale and public safety.

In May 1989, Broderick testified before the Public Safety Committee of the Boston City Council on the subject of "sector integrity," a policy governing the assignment of BPD officers to high-crime areas. His testimony covered his disagreement with the policy as well as his criticism of "the BPD's management structure under Roache." Verified Complaint, ¶ 13(h). Throughout the rest of 1989 and 1990, Broderick's criticisms of Roache and the BPD were often quoted in the local media.

In April 1989 Broderick underwent a three-day disciplinary hearing on the charge that he had failed to give proper notice and to properly report to work on days when he was scheduled for release time to perform Federation duties. Broderick argued that he did not know, was not informed, and did not believe that he was in violation of the reporting policy. The hearing resulted in a seven-day suspension, which Broderick served in July. Broderick appealed the suspension to the Civil Service Commission, which overturned it. The BPD has filed notice of appeal.

On April 18, 1989, Broderick received notice that he would be required to undergo a second disciplinary hearing on charges that he had violated BPD rules and regulations in conducting an arrest which took place in February 1988 (the infamous Kathleen Bean incident). Although Broderick's handling of the arrest had previously been completely vindicated by a departmental investigation, the Bean trial board found Broderick guilty of poor judgment and he was suspended for ten days without pay. Broderick filed an appeal with the Civil Service Commission, which again overturned his suspension. The BPD's appeal of this decision was denied.

In December 1989, Broderick received a letter from Superintendent Paul Evans reprimanding him and ordering him to undergo a taped interrogation concerning various statements attributed to him by the *Boston Globe*. Broderick alleges that he was "coercively interrogated about his statements" and that the letter and interrogation "were not designed to serve legitimate operational needs of the BPD but instead were intended to punish [him] for exercising his right to free speech and [to] chill the future exercise of that right." Verified Complaint, ¶ 27.

In May 1990, Broderick was notified that he would be required to attend a third disciplinary hearing in connection with his arrest of cab-driver Ezekiel Oluh in November 1989. This hearing resulted in a forty-five day suspension and an order to submit to psychiatric examination, both of which Broderick has contested. *See* Plaintiffs' Trial Document, ¶¶ 80, 82.

## III. *Argument*

The City of Boston argues that whether or not the actions of its employees are ultimately determined to amount to impermissible retaliation for the exercise of secured rights, no liability can attach to the

City itself under the provisions of MCRA. While this is concededly a difficult question of first impression, it appears clear that, under MCRA, municipalities are responsible for unconstitutional policies carried out by their employees.

### a. Liability of Municipalities for Acts of Employees

■ In support of its motion for summary judgment, the City first argues that a corporate entity such as the City of Boston cannot be held vicariously liable under MCRA for the actions of its employees. To support this proposition, the City relies on *Jones v. City of Boston*, 738 F.Supp. 604 (D.Mass.1990), which held that the doctrine of respondeat superior does not apply to MCRA claims.

In *Jones*, the district court acknowledged that no Massachusetts state court had yet addressed the question of vicarious liability under MCRA section 11I. However, as the district court noted, MCRA and section 1983 are parallel statutes. *See Jones*, 738 F.Supp. 604, 606 (citing *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822–23, 473 N.E.2d 1128, 1131 (1985)). Therefore, because the doctrine of respondeat superior does not apply to section 1983 claims, *see Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), the district court concluded that a state court would hold respondeat superior inapplicable to claims brought under MCRA as well. *See Jones*, 738 F.Supp. 604, 606.

Thus, the City argues correctly that it may not be held liable under MCRA on a theory of respondeat superior. That, however, is not the theory upon which Broderick relies. Rather, Broderick argues that the City should be held directly liable by analogy to the "unconstitutional policy" prong of *Monell*:

Local governing bodies ... can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers. Moreover, ... local governments ... by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36.[2]

In cases following *Monell*, the Supreme Court articulated more fully the contours of section 1983 municipal liability under the unconstitutional policy theory. In so doing, the Court "assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (citing *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) and *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)).[3] Then, in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), Justice Brennan defined more specifically the circumstances in which a single decision might appropriately be considered to establish an unconstitutional policy.

First, a municipality may be held liable only for acts "which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480, 106 S.Ct. at 1298 (majority opinion). Second, a municipality may be held liable only when the decision-

2. Justice Brennan, in *Pembaur v. Cincinnati*, 475 U.S. 469, 481 n. 10, 106 S.Ct. 1292, 1299 n. 10, 89 L.Ed.2d 452 (1986) distinguished "policy" from "custom," raising the possibility that the standards under these two branches of *Monell* might not be identical. Although plaintiffs quote the *Monell* language concerning "custom" in their brief opposing the City's motion for summary judgment, they nevertheless appear to

be proceeding under the "policy" branch of the analysis.

3. Despite the fact that Broderick himself raises the "single decision" branch of *Monell* as the appropriate analysis, his complaint might fairly be read to allege an entire series of decisions to retaliate against him.

maker "possesses final authority to estab-- lish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. at 1299 (plurality opinion). Third, "whether an official ha[s] final policymaking authority is a question of state law." *Id.* at 483, 106 S.Ct. at 1300 (plurality opinion). Fourth, in order for municipal liability to attach, the decisionmaker must be the official "responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483 & n. 12, 106 S.Ct. at 1300 & n. 12 (plurality opinion). *See also Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924 (identifying and approving same four elements).

Whether the Massachusetts state courts will adopt the section 1983 unconstitutional policy theory of municipal liability and the four *Pembaur* elements as the standard under MCRA is open to conjecture. However, the Supreme Judicial Court has already stated both that MCRA and section 1983 are parallel statutes, *see Batchelder,* 393 Mass. 819, 822–23, 473 N.E.2d 1128, and that it should be presumed that the state legislature was aware of existing case law under section 1983 when it patterned MCRA after the federal act. *See Duarte v. Healy,* 405 Mass. 43, 47, 537 N.E.2d 1230, 1232 (1989). Although *Monell* was decided in 1977, the four *Pembaur* elements had not yet been articulated in 1979 when MCRA was passed. Nevertheless, because the Supreme Judicial Court has concluded that "the Legislature intended to provide a remedy under [MCRA] coextensive with [section 1983]" (except for the state action requirement),

*Batchelder,* 393 Mass. 819, 822–23, 473 N.E.2d 1128, this court will proceed under the assumption that the state courts would adopt both the *Monell* unconstitutional policy theory of municipal liability and the *Pembaur* elements.[4] But because neither Broderick nor the City has addressed the factual questions raised by the *Pembaur* elements, it would be inappropriate to grant the City's motion for summary judgment on this ground.

b. *Threats, Intimidation, or Coercion*

The City's second argument in support of its motion for summary judgment is that Broderick has failed to allege an actual or potential physical confrontation accompanied by a threat of harm—an element the City contends is required in order to show a violation of MCRA. Broderick disputes this contention.

The focus of the disagreement between the parties is language in MCRA providing that attempts to interfere with the exercise of secured rights by "threats, intimidation or coercion" are actionable. Mass.Gen.L. ch. 12 § 11I (1986). The City cites several precedents for the proposition that the threat, intimidation, or coercion must be physical or at least potentially physical. *See, e.g., Layne v. Superintendent, Massachusetts Correctional Institution,* 406 Mass. 156, 158, 546 N.E.2d 166, 168 (1989) (holding that moving library to basement did not violate the rights of mobility-impaired prisoners under MCRA because there was no threat, intimidation, or coercion nor any actual or potential physical

---

**4.** As the plaintiffs note, the Supreme Judicial Court of Massachusetts recently declined to decide "whether the Legislature intended to adopt the *Monell* standard when it enacted" MCRA. *Rodriques v. Furtado,* 410 Mass. 878, 889 n. 14, 575 N.E.2d 1124, 1131 n. 14 (1991). As the *Rodriques* court formulates the *Monell* standard, it is that "a municipality will be liable under § 1983 only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' to the plaintiff." *Rodriques,* 410 Mass. 878, 889 n. 14, 575 N.E.2d 1124 (quoting from *Monell,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037). The context of this comment leaves it unclear whether the *Rodriques* court was referring to

the *Monell* standard of municipal liability for unconstitutional policies, to the *Monell* standard of causation, or to the *Monell* standard concerning which officials may by their actions subject municipalities to liability.

Be that as it may, this court is fortified in its conviction that the state courts would approve the unconstitutional policy theory of municipal liability by another comment of the *Rodriques* court. The court stated that "[t]here is no evidence in the record that the city, *directly or indirectly through Furtado,* threatened, intimidated, or coerced the plaintiff." 410 Mass. 878, 889, 575 N.E.2d 1124 (emphasis added). This comment seems to indicate that the *Rodriques* court contemplated direct municipal liability predicated upon the actions of a city employee.

confrontation or threat of harm). However, painstaking perusal of these precedents indicates that they do not clearly require a physical confrontation.

■ The "essential element" of a MCRA violation is threat, intimidation, or coercion. *See Layne*, 406 Mass. 156, 158, 546 N.E.2d 166. Direct deprivation of a secured right will not violate MCRA because it "lacks the quality of coercion." *Butler v. RMS Technologies, Inc.*, 741 F.Supp. 1008, 1011 (D.Mass.1990). *See also Longval v. Commissioner of Correction*, 404 Mass. 325, 333, 535 N.E.2d 588, 593 (1989) ("A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate [MCRA].") To violate MCRA there must be, in addition to the deprivation itself, "something akin to duress which causes the victim to relinquish her rights." *Butler*, 741 F.Supp. 1008, 1011.

■ Because actual or potential physical duress is easily identified, it has often served as a proxy for "threats, intimidation, or coercion" in the decisions addressing MCRA violations. *See, e.g., Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 823, 473 N.E.2d 1128, 1131 (1985) (finding that order by uniformed security officer to stop soliciting signatures, an order which carried with it an implicit threat of ejection from the premises, constituted sufficient intimidation or coercion to satisfy MCRA); *Bell v. Mazza*, 394 Mass. 176, 183–84, 474 N.E.2d 1111, 1116 (1985) (finding that neighbors' threat—to "do anything at any cost" to prevent homeowners' construction of tennis court—and accompanying physical prevention of homeowners' passage constituted "threats, intimidation or coercion"); *O'Connell v. Chasdi*, 400 Mass. 686, 694, 511 N.E.2d 349, 353 (1987) (finding that verbal and physical sexual harassment—including employer's threats

to terminate victim's employment if she did not submit to his advances—violated MCRA).

Although actual or potential physical confrontation was arguably present in all of these cases, in none of them did the court suggest that the physical nature of the threat involved was a decisive consideration in the court's finding that MCRA had been violated. Nor did *Bally v. Northeastern University*, 403 Mass. 713, 532 N.E.2d 49 (1989), which summarized these cases, hold that physical duress is the *sine qua non* of a MCRA violation. The *Bally* court merely mentioned physical confrontation as one of the factors which distinguished Bally's claim from those which the court had previously held to violate MCRA. *See id.* at 718–20, 532 N.E.2d 49.

The *Bally* court also discussed *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95, 502 N.E.2d 1375, 1379 (1987), which involved no physical confrontation at all. In *Redgrave*, the court held that the BSO's cancellation of its contract with Redgrave, which had the effect of coercing her not to exercise her First Amendment rights, violated MCRA. The *Bally* court did not suggest that the *Redgrave* decision was inappropriate in any way.

*Layne*, the prisoners' rights case relied upon by the City, discusses *Bally*, stating that in *Bally* "this court noted that all our opinions holding that a defendant was or might be liable under [MCRA] involved an actual or potential physical confrontation accompanied by a threat of harm." *Layne*, 406 Mass. 156, 158, 546 N.E.2d 166.[5] In making this claim, the *Layne* court overlooked the fact that the *Bally* court had discussed *Redgrave* with approval. Until and unless *Redgrave* is more explicitly disavowed, this court must assume that it remains good law.[6]

Thus, despite the frequency with which situations involving physical confrontation

**5.** The crux of the *Layne* case was that while the mobility-impaired prisoners might have been *directly* deprived of certain rights, "[t]he act of moving the libraries to the basement level ... did not involve 'threats, intimidation or coercion'"—physical or non-physical. *Layne*, 406 Mass. 156, 158, 546 N.E.2d 166.

**6.** The First Circuit cases cited by the City are similarly ambiguous. The court in *Wynne v. Tufts University School of Medicine*, 932 F.2d 19, 28–29 (1st Cir.1991) declined to resolve the question of whether physical confrontation was required (although it read *Layne* to impose such a requirement). The court in *Butler v. RMS Technologies, Inc.*, 741 F.Supp. 1008, 1011 (D.Mass.

have arisen, that element is not required to make out a MCRA violation. *See, e.g., Redgrave,* 399 Mass. 93, 95, 502 N.E.2d 1375 (finding that the BSO's cancellation of its contract with Redgrave, which had the effect of coercing her not to exercise her First Amendment rights, violated MCRA); *Deas v. Dempsey,* 403 Mass. 468, 471, 530 N.E.2d 1239, 1241 (1988) (defining "coercion" as "the application to another of such force, *either physical or moral,* as to constrain him to do against his will something he would not otherwise have done") (emphasis added); *Delaney v. Chief of Police of Wareham,* 27 Mass.App.Ct. 398, 409, 539 N.E.2d 65, 72 (1989) (defining "threat" as "acts or language by which another is placed in fear or injury or damage"; "intimidation" as "creation of fear to compel conduct"; and "coercion" as "the active domination of another's will"). Cases which the City reads to suggest that physical duress is a required element merely have used the terminology of physical confrontation to indicate either that a direct deprivation of rights alone will not suffice to violate MCRA or that the deprivation was not targeted at a particular individual or class. A scheme of harassment like that alleged by Broderick, even one carried out by non-physical threats or intimidation, would, if it induced him to give up secured rights, violate MCRA.

Plaintiffs have demonstrated a genuine dispute of material fact as to whether the City, through the individual defendants, attempted to threaten, intimidate, or coerce Broderick through a scheme of harassment and retaliation. Because Broderick has presented evidence which could conceivably allow a reasonable jury to return a verdict in his favor, the City's motion for summary judgment is denied.

SO ORDERED.

---

1990), also cites *Layne,* stating that actual or potential physical confrontation is required, but immediately vitiates the force of that statement by noting that "[t]here must be *something akin to duress* which causes the victim to relinquish her rights." *Id.* at 1011 (emphasis added) (footnote omitted). Moreover, as explained above, *Layne* is of questionable authority on this point because it neglects to deal with *Redgrave.*