## DAVID F. BALLY *vs.* NORTHEASTERN UNIVERSITY.

Suffolk. September 14, 1988. — January 9, 1989.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Controlled Substances. Civil Rights*, Availability of remedy, Coercion. *Privacy.*

A student athlete at a private nonprofit university, who refused to consent to monitored urinalysis to screen for certain drugs as a condition of his participation in intercollegiate sports, did not demonstrate that any interference with any of his civil rights by such a university policy was by "threats, intimidation, or coercion," as required by the Massachusetts Civil Rights Act. [717-718]

A claim of violation of civil rights under the Massachusetts Civil Rights Act which alleged no direct assault, nor an individualized threat, nor a threat of serious harm did not entitle the plaintiff to relief. [718-719]

A student athlete at a private nonprofit university, who refused to consent to monitored urinalysis to screen for certain drugs as a condition of his participation in intercollegiate sports, stated no claim entitling him to relief under the right to privacy statute, G. L. c. 214, § 1B, where he alleged no actual or threatened public disclosure of any confidential information. [720-721]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on Janaury 13, 1987.

On transfer to the Superior Court Department the case was heard by *Paul K. Connolly*, J., on a motion for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Jeffrey F. Jones (Michael N. Sheetz* with him) for the defendant.

*David C. Casey (David Hoffman* with him) for the plaintiff.

*James M. Shannon*, Attorney General, *Virginia N. Lee & Barbara B. Dickey*, Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

*Paul R. Friedman* of the District of Columbia & *Wayne S. Henderson*, for New England Legal Foundation, amicus curiae, submitted a brief.

HENNESSEY, C.J. David F. Bally commenced this action before a single justice of the Supreme Judicial Court challenging Northeastern University's drug testing program for student athletes on its intercollegiate athletic teams. Bally alleged that Northeastern's policy requiring student athletes to consent to drug testing as a condition of participating in intercollegiate sports violated his civil rights under G. L. c. 12, §§ 11H and 11I, and his right to privacy under G. L. c. 214, § 1B, and constituted a breach of contract. The single justice denied Bally's motion for a preliminary injunction and transferred the case to the Superior Court in Suffolk County for further proceedings.

The parties filed a statement of agreed facts and Bally moved for summary judgment, seeking only declaratory relief. The Superior Court judge granted summary judgment for Bally on two counts, declaring that Northeastern's drug testing program violated G. L. c. 12, §§ 11H and 11I (Massachusetts Civil Rights Act), and G. L. c. 214, § 1B (right of privacy statute). The judge granted summary judgment for Northeastern on the third count, declaring that the university had not violated any contractual duties owed to Bally.

Only Northeastern appealed. We allowed Northeastern's application for direct appellate review. We now reverse the judgment.

We summarize the relevant facts from the agreed statement. Bally is a student at Northeastern University, a private, non-profit institution of higher education, in Boston. Until January, 1987, Bally was a member of the indoor and outdoor track teams, as well as the cross-country team. Northeastern places numerous conditions on participation in intercollegiate athletics,[1] including signing of a National Collegiate Athletic As-

---

[1] Northeastern requires all student athletes to undergo medical examinations before each academic year as a condition of participation in intercol-

sociation (NCAA)[2] student athlete statement. The statement includes an NCAA drug testing consent form. In 1986, Northeastern began to require that varsity athletes also sign the university's drug testing consent form authorizing drug testing by urinalysis as a condition of participation in intercollegiate athletics.

In November, 1986, Bally signed the NCAA student athlete statement for the 1986-1987 academic year. He later revoked it by a letter dated March 12, 1987. Bally refused to sign Northeastern's drug testing form, as well as the NCAA's drug testing consent form for the 1987-1988 academic year. Northeastern declared Bally ineligible to participate in the varsity indoor track and cross-country teams. Except for his refusal to sign the NCAA and Northeastern consent forms, Bally has met Northeastern's conditions for eligibility to compete in varsity sports.

Northeastern prohibits the use of those drugs which the NCAA has banned, including certain illicit drugs, some prescribed drugs, and some over-the-counter medications. The parties submitted, as part of their statement of agreed facts, a fifty-five page list of NCAA banned drugs. Northeastern's drug tests do not test for the presence of many of the drugs that the NCAA has banned. Northeastern's program requires that a student athlete consent to drug testing, through urinalysis, during post-season competition as well as during the regular season. The program requires that student athletes be tested once annually for certain drugs: viz., amphetamines, barbiturates, benzodiazepine, cannabinoid, cocaine, methaqualone, opiates, and phencyclidine. The program also mandates random testing throughout the academic year, and requires testing of

---

legiate athletics. The examinations include the giving of blood and urine samples for medical testing purposes. The urine sample, however, is neither monitored nor tested for the presence of drugs.

[2] The NCAA is a membership organization which governs and regulates the majority of intercollegiate competition among public and private colleges and universities in the United States. Northeastern is a member of the NCAA and must comply with NCAA requirements to be allowed to compete in NCAA events.

athletes before any NCAA post-season competition. To date, Northeastern has only tested athletes participating in post-season NCAA competition. The random and post-season testing screen for the previously mentioned drugs, anabolic steroids (a substance which sometimes increases muscle mass and may enhance athletic performance), and testosterone. When presenting drug testing forms to student athletes and asking for their signatures, an athletic director explains that students who refuse to sign the consent form will be ineligible to participate in intercollegiate sports, and may lose any athletic scholarships.

Northeastern cites as its reasons for instituting its drug testing program a desire: (a) to promote the health and physical safety of student athletes; (b) to promote fair intrateam and intercollegiate competition; and (c) to ensure that Northeastern student athletes, as role models to other students and as representatives of Northeastern to the public, are not perceived as drug users.

The actual testing process requires that a monitor of the same sex as the student athlete observe the athlete's urination when providing a urine specimen. This is the only means of ensuring that the athlete submits his or her own urine to be tested. Drug-free urine is commercially available and, without a monitor, could be substituted for the athlete's. The urine specimens are labeled by a number code. Only the director of Northeastern's Lane Health Center and Student Health Services has access to the identity of the specimen's donor. A specimen which tests positive will be retested, by using another portion of the same sample. Specimens which test negative on either the initial or second test are not tested further.

If both the initial and second tests are positive, another portion of the same urine sample will be tested by a different method. If this test is positive, the student athlete is notified and requested to confer with the director of the University's Lane Health Center and Student Health Services. The director decides whether to begin counselling the student. The student athlete is given follow-up testing. If a follow-up test is negative, the individualized process ends and the student is simply once again subject to further testing. If a follow-up test is positive, the student is suspended from the team; the athletic director,

head coach, and student's parents are notified; and the student athlete is required to attend a formal drug counselling program as a condition of further athletic participation. The student athlete is then tested at regular intervals and remains suspended from the team until he or she tests negative. If a student tests positive at any time after rejoining a team, he or she will be dismissed from the team for the entire academic year. Thereafter, any positive test result permanently bans the student from participating in intercollegiate athletics at Northeastern. At any point in the process, the student may appeal to the university's drug testing review and appeals committee.

The Superior Court judge declared that Northeastern's program violated Bally's rights under the Massachusetts Civil Rights Act and the right of privacy statute.[3] We do not agree.

1. *G. L. c. 12, §§ 11H and 11I.*

To establish a claim under the Massachusetts Civil Rights Act (Act), G. L. c. 12, § 11I, Bally must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion." See G. L. c. 12, § 11H.[4]

---

[3] Bally asserts his rights under the statutes because he proceeds here against a private institution. No State action is alleged or shown. In *Horsemen's Benevolent & Protective Ass'n* v. *State Racing Comm'n, ante* 692, 693, 694 n.1 (1989), the plaintiff asserted rights under art. 14 of the Massachusetts Constitution because the proceeding was premised on actions by a State agency. Thus, the two cases emphatically differ as to applicable law and legal analysis. Bally fails because he does not show a violation of the State statutes, a burden which the plaintiff in *Horsemen's* did not have.

The Supreme Court has rejected the argument that action by the NCAA is State action. *National Collegiate Athletic Ass'n* v. *Tarkanian,* 488 U.S. (1988) (109 S. Ct. 454, 462-465 [1988]). In any event, Bally seeks relief against Northeastern rather than the NCAA.

[4] General Laws c. 12, § 11H (1986 ed.), states in pertinent part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate

Even if we assume, without deciding, that, as Bally argues, Northeastern has interfered with his "secured" right to be protected against unreasonable searches and seizures and his right to be protected against invasion of his reasonable expectation of privacy under the Fourth Amendment, under art. 14, and under the right of privacy statute, his claim fails for lack of proof of "threats, intimidation or coercion." See G. L. c. 12, § 11H.

We have previously stated that this court's primary function in interpreting the Civil Rights Act is to ascertain the "intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced." *Deas* v. *Dempsey*, *ante* 468, 470 (1988), quoting *Glasser* v. *Director of the Div. of Employment Sec.*, 393 Mass. 574, 577 (1984). The Civil Rights Act was "intended to provide a remedy for victims of racial harassment." *O'Connell* v. *Chasdi*, 400 Mass. 686, 694 (1987), citing *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 821 (1985) (*Batchelder II*). We have also recognized that, by reaching private party actions, the Legislature did not intend to create "a vast constitutional tort," and thus explicitly limited the Civil Rights Act's remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion. *Bell* v. *Mazza*, 394 Mass. 176, 182-183 (1985). G. L. c. 12, § 11H.

Bally's claim differs from meritorious claims for which this court has granted relief under the Massachusetts Civil Rights Act. Those cases have all involved measures directed toward

equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."

General Laws c. 12, § 11I (1986 ed.), states: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

a particular individual or class of persons. For example, in *Batchelder II*, we held that a uniformed security officer ordering Batchelder to stop soliciting signatures and distributing his political handbills constituted sufficient intimidation or coercion to satisfy the Act. *Batchelder II, supra* at 823. In *Bell* v. *Mazza*, the defendant "threatened to do anything at any cost to prevent the plaintiffs' construction of the tennis court," and formed an association to prevent construction. *Bell* v. *Mazza, supra* at 183-184. We held that this action constituted sufficient "threats, intimidation or coercion" to survive a motion to dismiss for failure to state a claim. *Id.* Similarly, in *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 95 (1987), we stated that the Boston Symphony Orchestra violated the Act because its cancellation of its contract with Redgrave had the effect, intended or otherwise, desired or not, of coercing Redgrave not to exercise her First Amendment rights. Most recently, in another case we granted relief to a woman who was physically and verbally harassed by offensive sexual advances of her employer. *O'Connell* v. *Chasdi*, 400 Mass. 686, 687-688 (1987). We stated in *O'Connell* that "[s]exual harassment accomplished by threats, intimidation, or coercion constitutes precisely the kind of conduct proscribed by the act, and is similarly directed toward a class explicitly protected" by the Massachusetts Declaration of Rights. *Id.* at 694.

In this case, Northeastern is conditioning Bally's intercollegiate athletic participation on consent to drug testing by urinalysis. It is indiscriminate, impartially administered testing, and is not comparable with the direct assault found in cases where we have granted relief under the Massachusetts Civil Rights Act.

Bally's claim is further distinguishable from those cases where we have granted relief under the Civil Rights Act in terms of the nature of the threat. *Batchelder II, Bell* v. *Mazza*, and *O'Connell* v. *Chasdi* each involved a physical confrontation accompanied by a threat of harm. See *Batchelder II, supra* at 823 (uniformed security officer ordered Batchelder to stop soliciting signatures, with an implicit threat of physical ejection or arrest); *Bell* v. *Mazza, supra* at 183-184 (statements that

the defendant would "do anything at any cost to prevent the plaintiffs' construction of the tennis court," exceeded impoliteness and constituted threat); *O'Connell* v. *Chasdi, supra* at 687-688 (offensive sexual harassment, with explicit physical contact). Although *Redgrave* did not involve physical confrontation, the Boston Symphony Orchestra's action involved the loss of a contract right. *Redgrave, supra* at 95. Bally, in this case, alleges neither an individualized threat nor a threat of serious harm. Northeastern merely excluded Bally from intercollegiate sports. He is, therefore, not entitled to relief under the Civil Rights Act.

2. *G. L. c. 214, § 1B.*

Bally also contends that Northeastern's drug testing program violates the right of privacy statute. G. L. c. 214, § 1B. The Superior Court judge concluded that Northeastern's program "constitutes a significant intrusion into [Bally's] physical privacy, and coerces [him] to provide a source of personal physiological information." We disagree.

General Laws c. 214, § 1B, states simply, "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages." The majority of our opinions involving a claim of an invasion of privacy concern the public dissemination of information. See *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 307 n.9 (1982), citing *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn*, 374 Mass. 812, 819 (1978) (disclosure of police payroll records); *Commonwealth* v. *Wiseman*, 356 Mass. 251, 258-262 (1969) (showing of film concerning conditions at Massachusetts Correctional Institution at Bridgewater); *Attorney Gen.* v. *School Comm. of Northampton*, 375 Mass. 127, 132 (1978) (disclosure of names of job applicants). See also *Tower* v. *Hirschhorn*, 397 Mass. 581, 588 (1986) (defendant doctor divulged confidential medical information about plaintiff without her consent); *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 518 (1984) (stating that intracorporate communication constituted sufficient disclosure to violate § 1B).

In this case, Bally has not alleged any public disclosure of confidential information, real or threatened.[5] Bally quotes as support language in *Bratt* where this court stated that § 1B "proscribe[s] the required disclosure of facts about an individual that are of a highly personal or intimate nature." But we cited *Cort* v. *Bristol-Myers* and were referring to the private employment context. *Bratt, supra* at 518, citing *Cort* v. *Bristol-Myers Co., supra* at 307-308, and *id.* at 312 (Abrams, J., concurring) (reasonableness of requiring employee to disclose personal facts must be weighed against employer's valid business interests). This court noted in *Cort* that an employee may not be discharged for refusing to answer unreasonably intrusive inquiries of a personal nature. *Cort, supra* at 308 n.9. In this case, however, Bally alleges an invasion of privacy by a private university completely outside the scope of a private employment contract. His claim fails.

*Judgment reversed.*

---

[5] Because Bally does not raise the question, we need not now decide whether the right of privacy statute reaches attempted interference with a person's privacy. Compare G. L. c. 214, § 1B (prohibiting interference with one's privacy right), with G. L. c. 12, § 11H (prohibiting interference and attempted interference with one's civil rights).