Moriarty, J.
This is a civil action which was originally commenced in five counts. On September 6, 1991, summary judgment was entered for the defendants by another justice of this court (Simons J.) on Counts IV and V by agreement, and on Counts II and III over the objection of the plaintiff. The case came on for trial before me on the remaining count (Count I) during the April sitting of the court in Pittsfield. In Count I the plaintiff charges the defendants with interfering with her civil rights in violation of G.L.c. 12, §§11H and 111.
The case was tried before me without a jury and the trial was completed in Springfield on June 23, 1993. On the basis of the evidence presented at that trial and a number of stipulations of the parties, I made the following findings of fact.
Tech Tool Grinding and Supply, Inc. (Tech Tool) is a small (23 employees) business corporation which is located in the City of Pittsfield and engaged in the business of manufacturing cutting tools.
The work that Tech Tool does requires the grinding of high-carbon steel to very close tolerances. Some of the work is done manually by holding the tool that is being sharpened against an abrasive wheel spinning at a speed of 1,750 RPM.[1] Other work involves the use of highly sophisticated (and expensive) machinery which requires the operator to input computer programs designed to accomplish particular tasks. The work requires the employees to be well trained, constantly alert and extremely careful. Too much pressure applied against a grinding wheel, for example, could cause the wheel to shatter and potentially injure not only the operator but anyone else in the vicinity of the accident. An error in the insertion of a computer program could not only result in a failure of the machine to properly perform the task at hand, but could also cause injury to the operator and damage to the machine itself. The tools that the company manufactures are razor sharp and must be handled with great care in order to avoid injury to the Tech Tool employees handling them in the course of the manufacturing process and to persons using them after they have been manufactured and shipped. A tool inadvertently dropped in the course of the manufacturing process, for example, could sustain a fracture invisible to the naked eye, but serious enough to cause the tool to splinter under the stress of operation with potentially disastrous consequences.
The defendant, Robert Morin (Morin), is the vice-president and forty-percent owner of Tech Tool. He assumed that position on December 21, 1988 after leaving the employ of the General Electric Company. The only other stockholder is one David McCulloch. At all times here in question, Morin was in charge of the day-to-day operation of the plant. He was the officer who dealt with the employees, scheduled the production and did the accounting. McCulloch was the president and majority shareholder of the company and in charge of sales and product development.
Shortly after he began his management of Tech Tool, Morin realized that the little company was not immune *16 from intrusion by the drug culture that was affecting nearly all levels of society. He learned that in 1985 an employee had been arrested on drug charges, and that in 1988 another employee had been sent to a 21-day substance abuse rehabilitation program at Hillcrest Hospital. In 1989 another employee was arrested for a narcotics violation, and Morin himself smelled marijuana smoke and found marijuana cigarette butts in the company rest room. He was told by some employees that other employees were smoking marijuana.
Morin was very concerned by the evidence of drug use by company employees that he had uncovered, and he shared his concern with McCulloch. Both men were very much aware of the high degree of alertness and caution that their work demanded of their employees, and of the serious consequences that could result from a drug-induced lapse of attention of one or more of them. As a result of their concern, on March 9, 1990 they jointly prepared a “Drug Screening Policy.” They decided that no later than March 12, 1990 they would post a notice of their intention to perform drug testing in April; that the testing would be performed at the 510 Medical Walkin Center on North Street in Pittsfield; that all full-time employees including themselves and all new employees would be tested; that any employee with a positive test would be re-tested after thirty days during which period the company would insure that the employee received proper help and counseling; and that a second positive test after such a thirty-day period could result in dismissal of the employee or his or her enrollment in a drug rehabilitation program.
The 510 Medical Walkin Center is a walk-in medical facility which provides outpatient medical care for most medical conditions. It has been in operation since 1983. It has a nine-person medical staff including three physicians. It treats about thirty patients per day and is employed by many companies and public agencies to conduct physical examinations, workers compensation evaluations and drug testing for their employees. Its role in drug testing is to collect urine samples and send them to a certified outside laboratory where the actual testing is performed.
In order to assure the integrity of the tests, the Medical Walkin Center follows the following procedure. When the patient arrives at the facility, he or she goes alone to an examining room and, in privacy, removes his or her clothes and dresses in a hospital gown. A medical assistant or doctor of the same sex as the patient then goes into the room with a drug screening test requisition, a thermometer, a urinalysis bottle and a container to collect the urine specimen. The medical assistant or doctor makes a brief visual examination of the patient to ensure that no vials of urine have been brought into the room by the patient.[2] The patient is then given a specimen container and goes alone to the bathroom to produce a urine sample. The faucets in the bathroom have been previously taped and a bluing put into the toilet so that water cannot be removed from a faucet or the toilet to dilute the sample. The medical assistant waits outside of the bathroom until the patient comes outwith a specimen. The patient is then taken back to the examining room where the temperature of the urine and a urinalysis test are taken to guard against any possibility of tampering. The urine specimen is then put into a bottle, the patient initials a piece of tape, the bottle is closed with a tamper-proof cap and the tape is affixed to seal the bottle over the top. The specimen and accompanying paperwork are then put into a box which is sealed with tamper-proof tape and hand delivered to the testing laboratory.
On March 12,1990, Morin posted the following notice on the employees’ bulletin board: “DRUG TESTING WILL BEGIN ON OR ABOUT APRIL 13. ANYONE TAKING DRUGS PLEASE STOP! BOB 3/12.” He deliberately allowed a full thirty days of notice in order to allow any employee who might have been taking drugs occasionally and was capable of doing so to cease the practice in ample time to avoid detection of the drug by the testing.
On the same day that he posted the notice, Morin called a meeting of all company employees to explain the new drug policy. He informed them that the purpose of the policy was to assure a drug-free environment at Tech Tool, and that the reasons behind the policy were the company’s desire (i) to protect its investment in the extensive training it had given its employees, (ii) to protect its investment in its very expensive machinery, (iii) to assure that its products would continue to have the same high quality that its customers had come to expect, and, most importantly, (iv) to protect its employees against any unnecessary risk of physical injury. He told them that none of them would lose their jobs if they tested positive. He explained that any such employee would be retested after thirty days, and if his or her test was still positive would be given the opportunity of undergoing drug counseling at company expense.
After the notice was published one employee left the company without explanation, and four others approached Morin to discuss their drug problems with him. The plaintiff in this case was not one of those employees.
On April 11, 1990, Morin called a meeting of all employees to explain the drug testing procedures at the Medical Walkin Center. He told them that they would be sent to the facility in pairs and that when they got there they would be required to disrobe completely and put on a hospital “johnny.” He explained in detail the procedures that would be followed and the reasons for those procedures.
The plaintiff, Beverly Folmsbee (Folmsbee), was employed as a tool grinder by Tech Tool at the time when the company introduced its new drug policy. She was then 54 years of age and had held that position for about one year and eight months. She had begun her employment in August of 1988 at a wage of $6.00 per hour and in April of 1990 was earning $8.50 per hour. She worked an average of 55 hours per week and *17 had been awarded some bonuses as a result of her job performance. She was at all times an employee at will.
Folmsbee enjoyed her job and had a good relationship with Morin and with her fellow employees. During 1989, her last full year of employment at Tech Tool, her gross wages totaled $23,170.38 plus fringe benefits (paid holidays, vacation, a profit sharing plan, health insurance, life insurance and a retirement or pension fund) with a total value equal to 23% of her wages.
Folmsbee was not a high school graduate and had very limited work experience before going to work for Tech Tool. She had never married but was a single mother and had spent the eighteen years from 1966 to 1984 at home raising her son. Her job at Tool Tech consisted primarily of sharpening step-bits, a steel product designed for use by electricians, by means of a manual grinder. She performed essentially the same task throughout her tenure with the company. She was never injured in the course of her employment and no one at Tool Tech ever had probable cause to believe, or even reason to suspect, that she had ever ingested illegal drugs.
Folmsbee saw the notice when Morin posted it on March 12, 1990 and she attended the meeting of employees that was held on that day. At that time she expressed no opposition to the policy or to the fact that she would be required to submit to drug testing. She maintained her silence throughout the thirty days that followed, but at the meeting held on April 11 she exclaimed, “You’ve got to be kidding!” when Morin explained the procedures that would have to be followed at the Medical Walkin Center.
On the following morning Folmsbee sought out Morin and told him that she was very upset. She told him that she had been up all night because she thought the proposed procedure (which she characterized as a “strip" test) degrading. She said that she would not take the test.
Morin told her, politely but firmly, that she would have to take the test if she wanted to continue on as an employee. She responded, “Bob, you’ve just fired me!” She repeated that accusation several times. Although Morin denied that he was firing Folmsbee, he refused to relent. Folmsbee left the premises and went home. She did not report for work the following day and she did not take the drug test. She returned about a week later and picked up her tool kit and her check.
All of the other full-time employees, including Morin and McCulloch, took the test without incident. There were two part-time employees who were not required to take the test. One of them, John Zuber, was a 67- or 68-year-old retiree of the General Electric Company who Tool Tech used to make small tools. He had his own little shop in the plant and worked pretty much when he felt like it. Molly McCulloch was McCulloch's mother. She was about 70 years old and came in on a part-time basis to do packing work and other odd jobs. Although Morin could offer no clear reason for excluding them from the program, he insisted that their age and Mrs. McCulloch’s relationship to the company president had nothing to do with it. Because they were part-time to the point that they were only called when needed and could be available or not as they chose, they were not considered to be part of the regular company workforce.
The Massachusetts Civil Rights Act (G.L.c.12, §§11H and 1II) provides a civil remedy to any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth, has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion by any other person, whether or not that person was acting under color of law.
In this case the plaintiff has identified two civil rights which she claims were interfered with by the defendants’ implementation of its drug testing policy. The first is her right to be free of unreasonable searches and seizures which is guaranteed by both the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights. The second is her right of privacy as guaranteed by G.L.c.214, §1B.
With regard to the plaintiffs claim of an unreasonable search and seizure, the defendants respond that there is no secured right to be free of searches and seizures by private individuals as distinguished from searches and seizures by governmental authority. They cite District Attorney for the Plymouth District v. Coffey, 386 Mass. 218, 434 NE.2d 1276 (1982), as authority for that proposition.
It is true that in the Coffey case the Supreme Judicial Court noted that it is well established that the Fourth Amendment applies only to searches and seizures conducted by or at the direction of the state. The Supreme Court of the United States has held that the Fourth Amendment’s origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation on other than governmental agencies. Burdeau v. McDowell 256 U.S. 465 (1921). Constitutional analysis of a search and seizure is triggered, the Supreme Judicial Court said, only when either the federal or state government is significantly involved in the search, either participating in it or directing it in some way. The court held that the same standard is applicable for purposes of Article 14 of the Massachusetts Declaration of Rights.
In the Coffey case, however, the issue was whether certain evidence obtained by the telephone company by means of a warrantless wiretap should be suppressed at the defendant’s criminal trial. The Massachusetts Civil Rights Act was in no way involved in that decision. In Bell v. Mazza, 394 Mass. 176, 474 NE.2d *18 1111 (1985), on the other hand, the Supreme Judicial Court specifically interpreted the term “secured right” as used in the MCRA, and expressly rejected a definition similar to that urged upon me by the defendants in this case. It said that it preferred the following definition which was expounded by Justice Brennan of the Supreme Court of the United States of the same term in an analogous federal statute. Justice Brennan wrote: “[A] right can be deemed ‘secured ... by the Constitution or laws of the United States,’ . . . even though only governmental interferences with the exercise of the right are prohibited by the Constitution itself (or another federal law). The term ‘secured’ means ‘created by, arising under or dependent upon’ ... rather than ‘fully protected.’ A right is ‘secured ... by the Constitution’ ... if it emanates from the Constitution, if it finds its source in the Constitution." The Supreme Judicial Court expressly adopted that definition for purposes of the Massachusetts Civil Rights Act.
Contrary to the defendants’ argument, I think it is clear that the right to be free of unreasonable searches and seizures is a right that emanates from or finds its source in both the federal and Massachusetts Constitutions. It follows that it is a “secured right” for purposes of the MCRA, even though the interferer is a private party rather than a governmental agency.
It is also established that requiring a person to submit a urine specimen under the supervision of a monitor and subjecting that specimen to chemical analysis constitutes a search and seizure for constitutional purposes under both the Fourth Amendment and Article 14 of the Declaration of Rights. Skinner v. Railway Labor Executives Association, 489 U.S. 602, 617 (1989), and Horseman’s Benevolent and Protective Association, Inc. v. State Racing Commission, 403 Mass. 692, 699, 532 NE.2d 644, 648 (1989). It does not necessarily follow, however, that the plaintiff is entitled to relief for interference with that secured right. She must first establish that such interference was “unreasonable” and that it was accomplished by “threats, intimidation or coercion.” In my opinion she has not been able to satisfy either of those two requirements.
Not surprisingly, there is a dearth of precedent as to the basis for determining the reasonableness of a search and seizure accomplished by or at the direction of a private employer as distinguished from a public agency. In the one case of which I am aware in which the issue might have been raised — Bally v. Northeastern University, 403 Mass. 713, 532 NE.2d 49 (1989) — the court assumed arguendo, but did not decide, that Northeastern had interfered with Bally’s “secured right” to be protected against invasion of his reasonable expectation of privacy under the Fourth Amendment, Article 14 and G.L.c. 214, §1B (the privacy statute), but held that his claim under the MCRA failed for lack of proof of “threats, intimidation or coercion.” Id. p. 718.
In those cases in which the issue has been dealt with the defendants have all been public agencies or officers and hence have involved rights of constitutional dimension rather than a mere statutory right. All of them were decided by a deeply divided court. See Horseman’s Benevolent and Protective Association, Inc. v. State Racing Commission, 403 Mass. 692, 699, 532 NE.2d 644,648 (1989); O’Connor v. Police Commissioner of Boston, 408 Mass. 324, 532 NE.2d 644 (1989); and Guiney v. Police Commission of Boston, 411 Mass. 328, 582 NE.2d 523 (1991). In all of them the majority has attempted to assess the reasonableness of a required drug test by balancing the need of the defendant to conduct the test against the invasiveness of the search and seizure. In one of them, the O’Connor case, the majority came down in favor of the defendant, and in the other two came down in favor of the plaintiff.
I am of the opinion that the proper method of assessing the reasonableness of a search and seizure conducted by or at the direction of a private employer is by balancing the employer’s legitimate business interests in conducting the search and seizure against the nature and substantiality of the intrusion. This is analogous to the test applied by the Supreme Judicial Court (Liacos, J. writing) for the purpose of evaluating whether an employer’s disclosure of personal information concerning an employee constitutes an unreasonable interference with his privacy right under G.L.c. 214, §1B. See Bratt v. International Business Machine Corp., 392 Mass. 508, 467 NE.2d 126, 135-36 (1984). When that test is applied in this case, the scale comes down in favor of Tech Tool.
Tech Tool has been able to articulate four reasons for which it instituted its drug testing program. Those reasons were the company’s desire (i) to protect its investment in the extensive training it had given its employees, (ii) to protect its investment in its very expensive machinery, (iii) to assure that its products would continue to have the same high quality that its customers had come to expect, and (iv) to protect its employees against any unnecessary risk of physical injury. Those are all good, legitimate business reasons. Employers do have a legitimate need to determine whether or not their employees are professionally, physically and psychologically capable of performing their duties. Bratt v. IBM, supra, 467 NE.2d at p.133. I am satisfied that Morin and McC-ulloch had a genuine and reasonable concern that those interests were in jeopardy because of the drug problems of some employees, and that it was for that reason than they instituted the program. That their concern was justified is evident from the fact that when the drug testing policy was announced one employee left and four others confided in Morin that they did indeed have a drug problem. That is over 20% of Tech Tool’s entire work force.
On the other side of the scale, the defendants were careful to make the testing process as unintrusive as possible. They retained the services of an established medical facility with extensive experience in drug testing to collect the samples, and they made the program *19 applicable to all full-time employees including the two owner-officers. The program did not require the patients to urinate in the presence of a monitor, but only to submit to a visual examination by a physician or medical assistant of the same sex in order to assure the integrity of the specimens. Although it is true that chemical analysis of a urine sample is capable of revealing personal information other than illicit drug use, detection of drug use was the only purpose for which the services of the medical facility were being commissioned, and there is no reason to believe that the facility would go beyond its commission in reporting its findings to the company.
As the Supreme Judicial Court noted in O’Connor v. Police Commissioner of Boston, supra, drug use is often difficult to discern, but it does have the potential to impair the perception, judgment, physical fitness and integrity of the user. Given the sensitive nature of Tech Tool’s manufacturing process, I am satisfied that on balance its decision to implement the drug testing policy in the manner it did so was completely reasonable.
Even if Tech Tool’s decision to implement the drug testing policy were unreasonable, the plaintiff would still be unable to prevail in her claim under MCRA because its interference with her “secured right” to be protected against unreasonable searches and seizures was not accomplished by “threats, intimidation or coercion.” The parties have stipulated that there was no physical threat, intimidation or coercion applied against the plaintiff. The plaintiff contends, however, that no physical confrontation is required, and that Morin’s threat to terminate her employment at will is sufficient to satisfy the requirements of the statute. I do not agree.
I am of the opinion that this case is controlled in this respect by the decisions of the court in Bally v. Northeastern University, supra, and Willitts v. Roman Catholic Archbishop, 411 Mass. 202, 581 NE.2d 475 (1991). In the Baüy case the plaintiff was a student at Northeastern, a private, non-profit institution of higher education in Boston, and a member of its indoor and outdoor track teams. In 1986, Northeastern began to require that varsity athletes sign a drug testing consent form authorizing drug testing by urinalysis as a condition of participation in intercollegiate athletics. Bally initially signed such a form but later revoked his consent. Northeastern declared him to be ineligible to participate in the indoor and outdoor track teams. Bally brought a civil action against Northeastern, alleging a violation of his civil rights under MCRA and a violation of his right to privacy under G.L.c.214, §1B.
As noted above (p. 12), the court assumed argu-endo, but did not decide, that Northeastern had interfered with Bally’s “secured right" to be protected against invasion of his reasonable expectation of privacy under the Fourth Amendment, Article 14 and G.L.c. 214, §1B (the privacy statute), but held that his claim under the MCRA failed for lack of proof of “threats, intimidation or coercion.” In reaching that conclusion the court pointed out that MCRA was intended by the Legislature to provide a remedy for victims of racial harassment, and was not intended to create “a vast constitutional tort.” It was for that reason, the court concluded, that the Legislature explicitly limited MCRA’s remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion.
The court in Bally reviewed a number of its prior decisions in which it had allowed claims under MCRA. In Batchelder v. Allied Stores Corp., 393 Mass. 819, 473 NE.2d 1128 (1985), it had held that an order from a uniformed security office ordering the plaintiff to stop soliciting signatures and distributing political handbills, carrying with it an implicit threat of physical ejection or arrest, constituted sufficient intimidation or coercion to satisfy the Act. In Bell v. Mazza, supra, the defendant had “threatened to do anything at any cost to prevent the plaintiffs’ construction of a tennis court,” and the court had held that to be sufficient “threats, intimidation or coercion” to survive a motion to dismiss for failure to state a claim. In Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 502 NE.2d 1375 (1987), the court had held that cancellation of the contract the defendant had with the plaintiff had the effect, intended or otherwise, of coercing Redgrave not to exercise her First Amendment rights. In O'Connell v. Chasdi, the court had granted relief to a woman who had been physically and verbally harassed by sexual advances of her employer.
The court concluded that Northeastern’s conditioning of Bally’s intercollegiate athletic participation on his consent to indiscriminate, impartially administered drug testing by urinalysis was not “comparable with the direct assault found in cases where [it] had granted relief under the Massachusetts Civil Rights Act.” (Emphasis supplied.) The court said: “Batchelder II, Bell v. Mazza, and O'Connell v. Chasdi each involved a physical confrontation accompanied by a threat of harm.” Although the court conceded that the Redgrave case did not involve physical confrontation, it pointed out that it did involve the loss of a contract right.
Employment at will is, of course, a form of contract. However, it does not give the employee any right to continued employment by the employer. The Supreme Judicial Court has said that “employment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all.” Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8; 525 NE.2d 411 (1988). The plaintiff in this case, therefore, lost no contract right when her employment by Tech Tool was terminated.
Although the Bally case did not involve an employment relationship, the loss by a student athlete of his ability to participate in intercollegiate athletics can be *20 just as devastating to the student as the loss of a job to an employee at will. It may have the effect of depriving the student of athletic scholarships, and even of the potential for future employment as a professional athlete. At the very least, it may deprive him or her of the esteem in which college athletes are traditionally held on college campuses.
In Willitts v. Roman Catholic Archbishop, supra, the case did involve an employment relationship but not employment at will. In that case the principal of the school in which the plaintiff had been employed as a teacher for a number of years under a series of one-year contracts refused to renew her contract for the 1987-1988 school year because she refused to agree to refrain from efforts to organize the teachers for collective bargaining purposes. She sought relief under MCRA on the ground that the principal had interfered with her rights to free speech and association by “threats, intimidation or coercion.”
The Willitts court held, citing Bally, that relief under the MCRA may be granted where the “threats, intimidation or coercion” involves either a physical confrontation accompanied by a threat of harm, or the loss of a contract right. There had been no physical confrontation, and Willitts had not lost a contract right because she had not had a contract for the 1987-1988 school year. Her complaint was of the failure of the school to renew her expired contract. “Such action by the school,” the court said, “falls outside the scope of what we recognize as ‘threats, intimidation or coercion’ required to state a claim under the Act.”
I conclude that the defendants’ treatment of the plaintiff in this case did not amount to “threats, intimidation or coercion” within the meaning of the Massachusetts Civil Rights Act.
The plaintiffs claim for violation of her right to privacy under the provisions of G.L.c.214, §1B has already been disposed of by the allowance of the defendants’ motion for summary judgment on Count II of her complaint. I note, however, that a similar claim was made by the plaintiff and denied by the court in the Bally case. In that case the court noted that the majority of its opinions involving a claim of an invasion of privacy concerned the public dissemination of information. In this case there is no allegation or suggestion that the defendants disseminated any information about the plaintiff to anyone or that they intended to do so.
Accordingly it is ordered that judgment be entered for the defendants dismissing Count I of the plaintiffs complaint, with costs.

 This is the type of work that the plaintiff performed during her tenure as a Tech Tool employee.

 It is a sad commentary on our society, but vials of urine intended for the purpose of frustrating urine drug-testing are commercially available.