Robert A. TEDESCHI

v.

Charles H. REARDON, individually and as High Sheriff of Essex County and the County Commission for Essex County and its Commissioners, Christopher Casey, Marguerite P. Kane and John V. O'Brien.

Civil Action No. 96–11317–RGS.

United States District Court,
D. Massachusetts.

April 21, 1998.

Timothy H. Barnes, Honig & Barnes, Haverhill, MA, for Plaintiff.

John J. Davis, William P. Breen, Jr., Morrison, Mahoney & Miller, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Robert Tedeschi brought this action under the federal civil rights statute (42 U.S.C. § 1983), the Massachusetts Civil Rights Act (G.L. c. 12, § 11I), the Massachusetts Wiretap Statute (G.L. c. 272, § 99) and the Massachusetts Privacy Act (G.L. c. 214, § 1B). The named defendants are Charles Reardon, a former Essex County High Sheriff, and Christopher Casey, Marguerite Kane and John O'Brien, the County Commissioners of Essex County ("Commissioners").[1] Tedeschi

1. In his Second Amended Complaint Tedeschi asserts the following claims against Reardon:

alleges that he was a victim of political retaliation because of his support for a candidate who ran unsuccessfully against Reardon for Sheriff and because of his refusal to accede to Reardon's demand that he "shake down" County inmates. He contends that, as a result, Reardon rescinded his eligibility for street details, removed him as a firearms instructor, refused to appoint him as head of an inmate electronic monitoring program, illegally intercepted his office telephone calls, spied on his political activities, and refused to renew his commission as a deputy sheriff. Finally, Tedeschi maintains that the Commissioners, as a matter of custom and practice, ratified and encouraged Reardon's unlawful acts.

The defendants contend that the material events recited in the Second Amended Complaint are alleged to have occurred between mid–1989 and January 1993 and are thus time-barred.[2] As for the substance of the claims, Reardon argues that political loyalty is a legitimate employment criterion for a deputy sheriff, justifying the termination of Tedeschi's commission. Reardon contends that there is no evidence to support Tedeschi's allegations of wiretapping and political spying. Reardon also denies having ever instructed Tedeschi to extort money from inmates. The Commissioners maintain that because Tedeschi has failed to produce evidence of an Essex County "custom or policy" condoning illegal activity on Reardon's part, the *Monell* aspect of the Complaint fails as a matter of law.

### FACTS

The material facts, taken in the light most favorable to Tedeschi as the non-moving party, are these. In 1985, Tedeschi was hired by Reardon as a correctional officer and ap-

pointed as a temporary Essex County deputy sheriff.[3] Reardon told Tedeschi that by attending the North East Regional Police Institute ("NERPI") and by taking some additional classes at the Correctional Officer's Academy ("COA"), he could satisfy the eligibility requirements for a permanent appointment. The training regimen was confirmed in writing by Kevin Leach, at the time the Superintendent of the Sheriff's Field Services Bureau. Tedeschi completed the NERPI and COA classes.

On December 8, 1987, Reardon commissioned Tedeschi as a full-time deputy sheriff. In 1988, Tedeschi was appointed as a firearms instructor at the Sheriff's "gun school." In May of 1989, Reardon asked Tedeschi to design and implement an electronic monitoring program for inmates. Reardon told Tedeschi that he would be reimbursed for any overtime and personal expenses that he incurred in setting up and administering the program. On September 8, 1989, Tedeschi was promoted to the correctional rank of Captain. His duties included oversight of the Electronic Monitoring Program ("EMP"). Between May of 1989 and March of 1990, Tedeschi was the only Sheriff's Department employee working full-time in the EMP. Despite Tedeschi's singular experience, in October of 1989, Reardon named Richard O'Leary as Director of Electronic Monitoring. Tedeschi alleges that Reardon instructed him to "shake down" inmates who wanted to participate in the EMP. When he refused, Tedeschi claims that Reardon told him that "If you don't do this, I will get somebody who will." Second Amended Complaint ¶ 14.

In March of 1990, Tedeschi began volunteer work for Kevin Leach, now a candidate for Essex County Commissioner.[4] In Janu-

---

Count I—42 U.S.C. § 1983; Count II—G.L. c. 214, § 1B; Count III—G.L. c. 12, §§ 11H and 11I; Count IV—G.L. c.272, § 99; Count V—Wrongful Discharge; and Count VI—Injunctive Relief. The Second Amended Complaint also contains two claims against the County Commissioners: Count I—42 U.S.C. § 1983; and Count II—G.L. c.272, § 99.

**2.** Tedeschi filed this lawsuit on June 27, 1996.

**3.** While a commission as a deputy sheriff carries no remuneration, it does confer general law en-

forcement powers and the right to serve process. See, e.g., *Commonwealth v. Howe*, 405 Mass. 332, 334, 540 N.E.2d 677 (1989). Correctional officers in Essex County were required to hold a deputy sheriff's commission to be eligible for street details. Lastih Aff. ¶ 6.

**4.** This is the date given in both versions of Tedeschi's Statement of Material Facts in Dispute. In his affidavit at ¶ 28, Tedeschi states that he began political work for Leach in 1988 or 1989.

ary and February of 1991, Reardon made several telephone calls to Tedeschi "expressing anger at his involvement in the Leach campaign." Tedeschi Aff. ¶ 30.[5] In May of 1991, Tedeschi received the first of a series of letters ordering him to attend classes required of part-time correctional officers, despite his full-time status. Between March and May of 1991, Tedeschi met on at least three occasions with Commissioner Kane to complain about Reardon's handling of the EMP, his loss of street and overtime details, and the directives to attend remedial classes. Tedeschi also filed a grievance with his union demanding reimbursement for his unpaid EMP overtime and expenses. Tedeschi maintains that the union would not process his grievance because the EMP was not covered under the union contract.[6] Tedeschi also filed a grievance with the Essex County Commission.[7] While the Commissioners held a hearing on his grievance, they ultimately took no action on his behalf. Leach Aff. ¶¶ 16–17.[8]

In 1992, Tedeschi began serving as an assistant campaign manager for Kevin Leach, who had decided to run against Reardon for Sheriff. Shortly thereafter, Reardon terminated Tedeschi as a firearms instructor.[9] In November of 1992, Reardon defeated Leach. On January 18, 1993, Reardon informed Tedeschi that he would not be reappointed as a deputy sheriff.[10] Reardon acknowledged that he was terminating Tedeschi's commission because of his campaigning for Leach. Lastih Aff. ¶¶ 3–5.

In 1996, Joseph Bogigian, the Director of Training for the Sheriff's Office, told Tedeschi that Reardon had secretly wiretapped Tedeschi's office telephone conversations and had identified Tedeschi as an attendee at several political functions by "running" his license plates. Tedeschi Aff. ¶¶ 39—41; Bogigian Aff. ¶¶ 9 and 10; Bogigian Dep., at 82–83. Bogigian also told Tedeschi that Reardon had terminated Tedeschi as a firearms instructor and had revoked his eligibility for street details because of his affiliation with Leach.[11] Tedeschi Aff. ¶ 41; Bogigian Aff. ¶¶ 7, 8 and 10. Thereafter, on June 27, 1996, Tedeschi filed this lawsuit.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495, 497 (1st. Cir.1993). A dispute of fact is only genuine if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994). While all reasonable inferences must be indulged in favor of the non-moving party, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988), a fact is considered material only when it has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). "Rule 56 may be used to determine the applicability of a statutory bar to a particular set of facts." *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 352 (1st Cir.1992).

5. Tedeschi alleges that Reardon called him intermittently through 1995 to complain about his involvement with Leach.

6. Tedeschi gave conflicting testimony in his deposition stating that he did not file a grievance with the union as "I had no faith in the union … I chose to do it through private counsel." Tedeschi Dep., at 204.

7. The Essex County Commissioners served as the Essex County Personnel Board. Leach Aff. ¶ 7.

8. Leach served as a County Commissioner from 1991 to 1995, and was Chairman of the Commission at the time of Tedeschi's hearing.

9. Reardon denies that he was involved in the decision to terminate Tedeschi as a firearms instructor. Reardon Aff. ¶ 20.

10. The loss of the commission had no adverse impact on Tedeschi's employment or rank as a correctional officer.

11. Tedeschi claims that he did not know why he had been dismissed as a firearms instructor until Bogigian told him in 1996. However, Tedeschi also testified that in late 1991 or early 1992, supervisors at the gun school told him that "they can't use you anymore … this thing between you and Charlie." Tedeschi Dep., at 204.

*Statute of Limitations*

Claims under § 1983 are subject to a three year statute of limitations.[12] *Johnson v. Rodriguez,* 943 F.2d 104, 107 (1st Cir.1991). A § 1983 action accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." *Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 (1st Cir.1995). "The knowledge required 'is not notice of every fact which must eventually be proved in support of a claim,' but rather 'knowledge that an injury has occurred.'" *Pagliuca v. Boston,* 35 Mass.App.Ct. 820, 824, 626 N.E.2d 625 (1994) (citations omitted). "Thus the key question to be answered here is temporal: at what juncture did [Tedeschi] reliably know of the injury to which this [claim] relates?" *Morris v. Government Development Bank of Puerto Rico,* 27 F.3d 746, 749 (1st Cir.1994).

■ Tedeschi's § 1983 claim is based upon violations of his "liberty, right of political affiliation and his constitutional right of freedom of association and freedom of speech." Second Amended Complaint ¶ 2. The Complaint as amended alleges "systematic" (sic) political retaliation motivated by Tedeschi's refusal to comply with "Reardon's request to 'shake down' inmates and Plaintiff's active participation in the campaign of Defendant Reardon's reelection opponent, Kevin J. Leach." Second Amended Complaint ¶ 22.

Defendants contend that because Tedeschi's commission was revoked on January 18, 1993, and because the extortion incident supposedly occurred in 1989, the lawsuit is barred by the statute of limitations. Tedeschi argues that he has alleged a "continuing violation," and therefore the statute of limitations closes only on the date of the last alleged retaliatory act (Reardon's 1995 directive to attend remedial training).

There are two varieties of continuing violations: serial and systemic. Serial violations are "composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate [actionable] wrong." ... Systemic violations, on the other hand,

"need not involve an identifiable discrete act of discrimination transpiring within the limitation period." Rather what must be shown is that plaintiff has been harmed by the application of a discriminatory *policy* or *practice* and that such policy continues into the limitations period.

*Muniz–Cabrero v. Ruiz,* 23 F.3d 607, 610 (1st Cir.1994) (citing *Jensen v. Frank,* 912 F.2d 517, 522–523 (1st Cir.1990)).

Tedeschi alleges serial violations stemming from two separate discriminatory animuses. The first arose in 1989, when Tedeschi refused Reardon's order to "shake down" inmates; the second in 1991, when Reardon became displeased with Tedeschi because of his political work for Leach. Reardon's indignation intensified in 1992 when Tedeschi actively supported Leach in his campaign against Reardon. After Reardon defeated Leach, he informed Tedeschi that he would not be reappointed as a deputy sheriff. A jury could reasonably find that a politically motivated animus incited Reardon to launch a campaign of harassment of sufficient duration to bring Tedeschi's retaliation claim within the statute of limitations.

■ The same cannot be said of Reardon's refusal in 1989 to appoint Tedeschi as Director of the EMP, allegedly in retaliation for his refusal to "shake down" inmates. Discrimination for reasons of political animus and retaliation for a refusal to participate in an extortionate scheme are sufficiently distinct to permit a finding as a matter of law that the one cannot be folded into the other to create a seamless § 1983 violation. This component of Tedeschi's § 1983 claim is therefore barred by the statute of limitations.

*Political Discrimination Claim*

■ The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits the dismissal of a public employee based solely upon his or her refusal to give support to a political supervisor (unless political loyalty is an appropriate requirement of

---

12. Tedeschi's Massachusetts Civil Rights Act claim also has a three year statute of limitations.

G.L. c. 260, § 5B.

the employee's job). *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The First Amendment also enjoins the dismissal of a public employee in a non-policy making position solely because of his or her political affiliations. *Branti v. Finkel,* 445 U.S. 507, 516–517, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Amended Complaint alleges that Tedeschi was not reappointed as a deputy sheriff because he refused to support Reardon's reelection effort. To succeed on a First Amendment political discrimination claim, Tedeschi must produce evidence that he was punished for this refusal and that political loyalty was not a legitimate requirement of his position as a deputy sheriff. If he surmounts this threshold, the burden shifts to Reardon to prove by a preponderance of the evidence that a deputy's job either entails political trust, or that Tedeschi was dismissed for other permissible reasons. *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Wytrwal v. Saco School Bd.,* 70 F.3d 165, 170 (1st Cir.1995).

■ Reardon maintains that Tedeschi in fact enjoyed a position of trust and confidence (as a deputy sheriff) because he "relied upon his group of deputies for counsel and advice in considering and deciding on matters of departmental policy." Reardon Memorandum, at 9. Reardon does not deny firing Tedeschi for political reasons, rather he argues that the firing was justified because "the group to which the plaintiff aspired was one from which [he] drew in forming departmental policy." Id., at 10.

■ Although fact-intensive, the determination whether a government position is "political" is a matter of law to be decided by the court. *Ortiz–Pinero v. Rivera–Arroyo,* 84 F.3d 7, 12 (1st Cir.1996). In searching out the contours that define a "position of trust," the most important consideration is the substance of the duties an employee in fact performs. Do the overall functions of the employee's department or agency involve "government decisionmaking on issues where there is room for political disagreement on goals or their implementation? ... [If so] the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–242 (1st Cir.1986) (en banc). Relevant factors include " 'relative pay, technical competence, power to control others, authority to speak in the name of policy-makers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders.' " *Id.,* at 242 (quoting *Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y.1982)). "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. 1287.

Reardon offers no evidence to dispute Tedeschi's testimony that Reardon never sought out or relied on his advice on matters of policy. Tedeschi Aff. ¶ 8. See *Jimenez Fuentes,* 807 F.2d at 244–245; *O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.1993). Nor is there any evidence that Tedeschi supervised others in the Sheriff's Office, formulated policy, or performed any public duties. Moreover, it is not clear that Reardon even meets the first prong of the test, which requires a showing that the Essex County Sheriff's Office is in fact a locus of discretionary political decisionmaking. See *Jones v. Dodson,* 727 F.2d 1329, 1338 (4th Cir.1984) ("Under the *Branti* test, we do not believe that the duties of deputy sheriffs, no matter what the size of the office, or the specific position of power involved, or the customary intimacy of the associations within the office, or the undoubted need for mutual trust and confidence within any law enforcement agency, could be found to involve policymaking related to 'partisan political interests' and to involve access to confidential information 'bearing ... on partisan political concerns.' ") I conclude as a matter of law that Tedeschi's employment as a deputy sheriff did not entail an element of political trust.

*Count II—Right of Privacy*

 Reardon also moves for summary judgment on Count II of the Second Amended Complaint which alleges violations of G.L. c. 214, § 1B (Privacy Act). This count goes to Reardon for two reasons. The first is that Tedeschi's claim that Reardon copied and "ran" the license plate number of his car while it was parked at political events does not state an action for invasion of privacy. To be actionable under G.L. c. 214, § 1B, an interference with the right to privacy must be unreasonable and either substantial or serious. *Ellis v. Safety Ins. Co.,* 41 Mass. App.Ct. 630, 637–638, 672 N.E.2d 979 (1996). While the issue is ordinarily one of fact, there is no reasonable expectation of privacy that Tedeschi can claim in the license plate number of his car (which is required by law to be prominently displayed). See *Commonwealth v. Hason,* 387 Mass. 169, 172–173, 439 N.E.2d 251 (1982); *Commonwealth v. Baldwin,* 11 Mass.App.Ct. 386, 390–391, 416 N.E.2d 544 (1981). Tedeschi's second claim, that Reardon's alleged wiretapping amounted to an invasion of his privacy, fails for the reason that the Legislature has given persons whose conversations are illegally intercepted a specific and exclusive statutory remedy. See G.L. c. 272, § 99 Q. Cf. *Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 585–586, 631 N.E.2d 555 (1994).

*Count III—Massachusetts Civil Rights Act*

 Count III alleges a cause of action under the Massachusetts Civil Rights Act, G.L. c. 12, § 11I. The purpose of the state Civil Rights Act is to provide under state law a remedy "coextensive with 42 U.S.C. § 1983 ... except that the Federal statute requires State action, whereas its State counterpart does not." *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822–823, 473 N.E.2d 1128 (1985). The Civil Rights Act is remedial in nature. It creates no substantive rights. *Mouradian v. General Electric Co.,* 23 Mass.App.Ct. 538, 543, 503

N.E.2d 1318 (1987). Moreover, in deference to a legislative concern that the Civil Rights Act not be interpreted to create a "vast constitutional tort," the Act is "explicitly limited ... to situations where the derogation of secured rights occurs by threats, intimidation or coercion," almost always arising in the context of a of physical confrontation. *Bally v. Northeastern University,* 403 Mass. 713, 718 & 719–720, 532 N.E.2d 49 (1989). Cf. *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 95, 502 N.E.2d 1375 (1987) (affirming a claim of contractual coercion). For purposes of the Civil Rights Act, " 'threat' ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm ... 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct ... ['Coercion' involves] 'the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.' " *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 474, 631 N.E.2d 985 (1994). Whether a defendant's actions were such as to induce fear or apprehension of harm in the victim is tested by an objective standard. *Id.* at 474–475, 631 N.E.2d 985. See *Batchelder,* 388 Mass. at 85–86, 445 N.E.2d 590 (threat of arrest by security guard); *Bell v. Mazza,* 394 Mass. 176, 179–180, 474 N.E.2d 1111 (1985) (physical threats); *Commonwealth v. Guilfoyle,* 402 Mass. 130, 132, 134, 521 N.E.2d 984 (1988) (racial harassment); *O'Connell v. Chasdi,* 400 Mass. 686, 687–688, 511 N.E.2d 349 (1987) (sexual harassment); *Langton v. Secretary of Public Safety,* 37 Mass.App.Ct. 15, 17–18, 20, 636 N.E.2d 299 (1994) (threats of retribution by prison officials); *Planned Parenthood League of Massachusetts,* 417 Mass. at 471–473 & n. 8, 631 N.E.2d 985 (invasion and blockade of an abortion clinic).[13] On the other hand, "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." *Longval*

---

**13.** While in *Planned Parenthood,* the Supreme Judicial Court in dicta recited a dictionary definition of "coercion" (quoted above) that seems to expand on the "physical confrontation" requirement of *Bally,* it must be read in the context of

the facts of the case. These involved a physical invasion and blockade of an abortion clinic intended to terrorize the clinic's staff and clients. I'd.

*v. Commissioner of Correction,* 404 Mass. 325, 333, 535 N.E.2d 588 (1989).[14]

Tedeschi's claim under the Massachusetts Civil Rights Act fails because there is no evidence of any "threat, intimidation or coercion" involving physical or morally coercive force sufficiently serious to satisfy the entry level burden of the Act. Nor does the alternate theory of coercive interference with a contractual right posited in *Redgrave,* supra (assuming that it remains viable) apply, as Tedeschi concedes that he had no contractual claim on his deputy sheriff's commission.

*Count IV—Massachusetts Wiretap Statute*

There is no basis for allowing summary judgment on this count, given Bogigian's affidavit and deposition testimony.

*Count V—Wrongful Discharge In Violation of Public Policy*

Count V, which alleges that Reardon "fired" Tedeschi because he refused to "shake down" inmates, is barred by the statute of limitations, for the reasons earlier explained.[15]

*Claims Against the County Commissioners*

*Count 1—§ 1983*

■ The claims asserted against the Commissioners are alleged in two separate counts, both based on the theory that by failing to exercise oversight of Reardon as High Sheriff, the Commissioners "caused" Reardon to violate Tedeschi's right of privacy and to retaliate against him politically.[16] Assuming that Essex County is not a "body

14. Reardon's retaliation against Tedeschi for his refusal to "shake down" inmates might be described as coercion undertaken to force Tedeschi to do something that the law forbids, however, any claim based on this incident is precluded by the statute of limitations for the reasons earlier explained.

15. Count VI requests that the court restrain Reardon from selling, transferring or disposing of his real property. This is an equitable claim for prejudgment relief that Tedeschi has not pursued.

16. I will assume for present purposes that Reardon was an "employee" of the County in fact answerable to the Commissioners rather than an independent elected official in his own right answerable only to the voters.

politic and corporate" for purposes of the Eleventh Amendment, see *Will v. Michigan Department of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989),[17] a municipal entity may be held liable under § 1983 only if it "causes" a constitutional violation[18] by implementing a constitutionally unsound policy, ordinance or regulation, or by condoning an unconstitutional custom or practice "so widespread as to have the force of law." *Bd. of County Commissioners of Bryan County, Okl. v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). See also *Monell v. Department of Social Services,* 436 U.S. 658, 690–691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A mere showing of respondeat superior is not enough. *City of Canton v. Harris,* 489 U.S. 378, 389–390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ Tedeschi does not allege the existence of a formal policy, but rather a custom and practice of supervisory misfeasance on the part of the Commissioners "so pervasive" as to have "actually caused" his injury. Tedeschi, however, has failed to offer any evidence that the Commissioners followed a "permanent and well-settled" practice of refusing to investigate complaints against Reardon. In its most favorable light, Tedeschi offers evidence that he met three times with Commissioner Kane to ask that the Commission intervene with Reardon on his behalf with respect to his overtime pay and loss of street details. Thereafter the Commission held an ineffectual hearing to consider his complaints. That the Commission failed to act vigorously in one case[19] (Tedes-

17. The Commissioners are being sued only in their official capacity.

18. I will assume for present purposes that the First Amendment to the United States Constitution does in fact guarantee a general "right" to privacy of the type plaintiff alleges.

19. While Tedeschi alludes to two other County employees who received no redress from the Commissioners for alleged illegalities inflicted by Reardon, he offers no facts or details. In any event, I doubt that even three cases would make out a *Monell* claim as a matter of law. Cf. *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 93–94 (1st Cir.1994).

**48**

chi's) falls far short of demonstrating a custom and practice in all (or most) cases.[20]

### ORDER

For the foregoing reasons, Reardon's motion for summary judgment is *DENIED* as to so much of Count I as alleges retaliatory discrimination stemming from plaintiff's political support of Kevin Leach. In all other respects the motion is *ALLOWED*. Reardon's motion for summary judgment is *ALLOWED* as to Counts II, III and V of the Second Amended Complaint, and is *DENIED* as to Count IV. The Commissioners' motion for summary judgment is *ALLOWED* as to Counts I and II of the second part of the Second Amended Complaint. The surviving claims are set for trial on Monday, June 8, 1998 at 9:00 A.M.

SO ORDERED.

---

**20.** The allegation that the Commissioners "caused" Tedeschi's telephone to be tapped stands on even flimsier ground. There is no evidence, nor even an allegation, that the Commissioners knew of Reardon's purported wiretapping, much less that they had a "custom or practice" of condoning electronic spying on County employees.