Walker, Joseph M., J.
In this action, plaintiff David Fromm (“Fromm”) and his real estate development company Keith Realty Corporation (“Keith Realty”) (collectively, “the plaintiffs”) have brought a sixty-three-count suit against twenty individual and agency defendants alleging various federal and state civil rights violations and tort claims due to an allegedly unlawful denial of building permits. The City Defendants[3] and defendant Sunny Brent Harding (“Har *491 ding”) (collectively, “the defendants") now move to dismiss all counts against them for failure to state a claim upon which relief can be granted, pursuant to Mass.RCiv.P. 12(b)(6). In addition, Harding moves to dismiss pursuant to G.L.c. 231, §59H, (the “anti-SLAPP statute”). For the following reasons, the defendants’ motions to dismiss under Rule 12(b)(6) are ALLOWED. Additionally, Harding’s special motion to dismiss under the anti-SLAPP statute is ALLOWED.

BACKGROUND

For purposes of a motion to dismiss under Rule 12(b)(6), the Court accepts as true the following factual allegations in the plaintiffs’ complaint.
Fromm is president and principal of the real estate development company Keith Realty. Beginning in 1997, Fromm, by and through Keith Realty, sought to develop twenty-two single-family townhouse units across eight lots of land on Washington, Guild and Juniper Streets in the Roxbuiy section of Boston (the “Project”). In October 1997, following several meetings with officials from the Boston Redevelopment Authority (“BRA”), Keith Realty submitted an application for building permits to the Inspectional Services Department of the City of Boston (“ISD”). The application was in compliance with the Boston Zoning Code (the “Code”) and included the requisite proposed architectural design and site plans. Pursuant to the Code, Keith Realty would undergo a design review process with the BRA as a first step toward attaining the building permits. Upon completion of the review, the BRA would transmit a certificate attesting to completion of the review to the ISD, which, in turn, would issue the requisite building permits. Keith Realty delivered copies of the proposed plan and design to the BRA to ensure that the BRA would have all of the necessary paperwork to begin its design review process for the Project.
In April 1998, the BRA informed Keith Realty that the review of the proposed design and site plans had not yet begun, but would start immediately. Over the next several months, representatives of Keith Really and the BRA held four to five meetings. During the last of these meetings, the BRA instructed Keith Realty to retain an architect to bring the design plan into compliance with changes the BRA would ultimately require. In response, Keith Realty engaged project architect Randy Cox to interface with the BRA’s design review personnel throughout the remainder of the design review process.
As part of the “standard operating procedure” of the BRA’s design review process, Keith Realty had to participate in a “community process,” whereby a developer holds or participates in a number of community meetings and events to solicit feedback from area residents regarding a proposed development. Throughout 1997 and 1998, Keith Realty participated in or held at least fourteen meetings or events, including an open house, an area association meeting, an abutters meeting, and a neighborhood council meeting. James Arthur Jemison (“Jemison”), Deputy of Roxbury for the BRA, oversaw the community process. In addition to the BRA personnel, staff from the Mayor’s Office of Neighborhood Services of Boston attended, participated in, or oversaw many of these meetings.
Sometime in 1998, Harding and other unnamed individuals organized and formed the Juniper Street and Friends Neighborhood Coalition (the “Coalition”) to oppose the Project. Over the course of the year, Harding and others within the Coalition held a number of community meetings, wrote articles to the local newspapers including the Boston Globe and the Roxbury Banner, and held a press conference. The Coalition also wrote letters to various individuals, government officials, and agencies, including Fromm, Boston Mayor Thomas Menino, Massachusetts State Senator Diane Wilkerson, and the Zoning Board of Appeals to express its opposition to the Project. Harding sent copies of their letters and other correspondence in opposition to the Project to the BRA. The plaintiffs claim that Harding met with BRA and ISD officials on several occasions to “stop, thwart or impede the issuance of design certification by the BRA and the issuance of building permits by the ISD” for the Project. The plaintiffs further allege that during one neighborhood meeting in July 1998, Harding implied that, because of Fromm’s race, which is Caucasian, she opposed Keith Realty’s efforts to develop properties in her neighborhood.
Upon a public review of documents in the BRA files, Keith Realty located copies of two newspaper articles, one from the Boston Globe and one from the Roxbury Banner. In an April 7, 1999 Boston Globe article, Harding was quoted as saying that she and her neighbors would like to keep their neighborhood “comfortable, middle class and black.” In an August 17, 1998 Roxbury Banner letter to the editor, Harding stated that she and her coalition had “established suggested development guidelines to help builders while minimizing delays in the permitting process. Mr. Fromm needs only to review them and work diligently to comply with the suggestions of neighbors he states he will be living among when his proposed project is complete.” Harding also stated in the letter that she wanted to put “developers on notice that we live here, we have vested interests in this community because our houses are our financial investments." These letters were kept in the normal course of the BRA’s business operations.
From October 30,1998 through February 1999, the BRA’s design review of the Project continued in an uninterrupted manner. Keith Realty worked in close conjunction with Jemison and Prataap Patrose (“Patrose”), a BRA architect, on the review process for the Project. Keith Realty made all of the changes that the BRA requested in a timely fashion and in full *492 compliance with the BRA’s requests. On January 9, 1999, Jemison wrote to Keith Realty that Keith Realty had made “significant effort and has provided us with sufficient information to review this project ...” By February 1999, Keith Realty’s application for review, with final revised plans, was complete and ready for final review and approval. From April-May 1999, the BRA conducted an extensive review of the Keith Realty’s final revised plans.
In April 1999, Jemison contacted Keith Realty’s legal counsel Appolo Caíala (“Caíala”) and informed him that the Project was scheduled for a design review approval hearing at the Board of Directors’ May 1999 meeting. On the day immediately prior to the meeting, without explanation, Jemison called Caíala and informed him that the BRA withdrew the Project from the meeting’s agenda. In response, Fromm called Jemison to inquire what had happened. Jemison responded by “threatening Fromm and admonishing him not to ‘make any waves’ or ‘rock the boat’ in any way if he ever wanted to see the BRA approve [Keith Realty’s] design review.” On May 25, 1999, Fromm called Collings to inquire why the Project had been removed from the agenda and asked when he could expect it to be rescheduled. Collings informed Fromm that consideration of the Project would go back on the agenda for the following month’s Board of Directors’ meeting. In fact, the Project was never rescheduled for consideration.
On January 30, 2001, Patrose spoke to Howard P. Speicher (“Speicher”), Keith Realty’s subsequent attorney. Patrose informed Speicher that project architect Randy Cox had complied with all the BRA’s changes and requests, which were all made at Patrose’s specific request on behalf of the BRA. Patrose told Speicher that he was not requesting any additional changes and that Patrose considered the design review complete as far as Patrose was concerned.
On May 4, 2001, Speicher spoke with Louis Santana (“Santana”), the plans examiner at the ISD. Santana informed Speicher that the Project was in full compliance with the Code and the only thing that the ISD was waiting for was certification from the BRA that the design review was complete. Although the Code empowers the ISD with the discretion to issue building permits without certification from the BRA, ISD Commissioner Kevin Joyce (“Joyce”) has maintained a policy of withholding building permits without such certification. When representatives of Keith Realty contacted the BRA to request that certification be made and sent to the ISD, the BRA responded that it had misplaced the final set of plans from February 1999 and that Keith Realty would need to resubmit the plans. The plaintiffs allege that the BRA offered no explanation for the misplacement.
On July 3, 2001, after Keith Realty resubmitted the final plans to the BRA, the BRA called a meeting at Boston City Hall to discuss the Project. Representatives of the BRA, Special Assistant Derek Small (“Small”) of the Mayor’s Office of Neighborhood Services, Keith Realty’s architects, and Keith Realty’s attorneys Caíala and Speicher attended the meeting. The BRA requested that Keith Realty undergo further community review because it had been two years since the company last presented the Project in a public forum. Small noted that the City of Boston’s concerns with the Project involved racial factors and considerations . Believing the company had undergone sufficient community review and citing the many BRA confirmations that Keith Realty’s application was complete, Keith Realty refused the BRA’s request.
On August 22, 2002, Fromm was diagnosed with Non-Hodgkins Lymphoma, which has since metatasized. Fromm alleges that Harding’s negligence contributed to his cancer. The plaintiffs allege a net loss of approximately $720,000 in rental income as a result of the Project’s four-year delay. Additionally, the plaintiffs allege $100,000 in expenses incurred in their effort to satisfy the demands of the City Defendants, and they seek to recover their expenses of $15,000 in uncollected rent and $15,000 in unnecessary expenses per month.
In November 2001, Keith Realty filed a complaint against the City of Boston, the ISD, and the BRA seeking relief in the nature of mandamus (Count I), and compensation, alleging a regulatory taking (Count II) (the “mandamus action”).[4] On a separate track while the mandamus action was pending, Keith Realty sought administrative review from the State Building Code Appeals Board regarding the ISD’s decision to deny Keith Realty’s application for building permits. On January 21, 2003, after a hearing, the Board ordered the ISD to issue the eight requested permits to Keith Realty. The ISD complied with the order, but subsequently appealed the Boards’ decision to the Suffolk Superior Court under G.L.c. 30A (the “Chapter 30A appeal”). Shortly thereafter, the Suffolk Superior Court (Connor, J.) dismissed both the mandamus claim, noting the pending Chapter 30A appeal seeking the same relief, and the takings claim, finding that Keith Really failed to demonstrate that he was “denied all economically beneficial or productive use of the land.” See Keith Realty Corp. v. BRA, City of Boston, and Kevin Joyce, as he is Commissioner of Inspectional Services, Civil No. 01-05440-C (Suffolk Super.Ct. June 25, 2003 and Sept. 19, 2003) (Connor, J.). On September 27, 2004, the Suffolk Superior Court (Troy, J.) decided the Chapter 30A appeal, and affirmed the Board’s order. See City of Boston, Inspectional Services Dept v. State Building Code Appeals Board, Civil No. 03-757 (Suffolk Super.Ct. Sept. 27, 2004) (Troy, J.).

DISCUSSION

The defendants have moved to dismiss on grounds that the plaintiffs fail to state a claim upon which relief can be granted. Harding also moves to dismiss pursuant to the anti-SLAPP statute. The Court considers each of these motions in turn, beginning with Harding’s special motion to dismiss under G.L.c. 231, §59H.
*493 J. Harding’s Motions to Dismiss A. Special Motion to Dismiss Pursuant to G.L.c. 231, §59H
The plaintiffs allege four primacy claims against Harding: (1) violation of due process rights pursuant to 42 U.S.C. §§1983 and 1988; (2) conspiracy to discriminate, in violation of 42 U.S.C. §1985; (3) violation of civil rights pursuant to the Massachusetts Civil Rights Act (“MCRA”); and (4) negligent infliction of emotional distress. Harding contends that the plaintiffs’ allegations against her are based on her lawful petitioning activities, in violation of G.L.c. 231, §59H, popularly known as the anti-SLAPP statute.[5]
The Legislature enacted the anti-SLAPP statute to protect citizens from suits designed to chill their constitutionally protected right to petition the government for redress of grievances. Wynne v. Creigle, 63 Mass.App.Ct. 246, 252 (2005), citing Duracraft Corp. v. Holmes Prod Corp., 427 Mass. 156, 161 (1998). “SLAPP suits target people for ‘reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature ... filing agency protests or appeals . . . and engaging in peaceful boycotts and demonstrations.’ ” Duracraft Corp., 427 Mass.App.Ct. at 161-62, quoting Pring, SLAPPS: Strategic Lawsuits Against Public Participation, 7 PACE ENVTL. L. REV. 3, 5 (1989). There are four criteria to SLAPP suits: “(1) a civil complaint or counterclaim (for monetary damages or injunction); (2) filed against nongovernmental individuals or groups; (3) because of their communications to a government body, official, or the electorate; and (4) on an issue of some public interest or concern.’’ Id., citing Pring, supra at 8.
For reasons grounded in judicial economy and fairness, the statute provides for early dismissal of such suits in order to immunize parties from claims “based on” their petitioning activities.[6] See Wynne, 63 Mass.App.Ct. at 252. However, special motions to dismiss brought against meritorious claims with a substantial basis other than or in addition to those petitioning activities will not be allowed. Id. at 252-53, citing Duracraft Corp., 427 Mass, at 167. Thus, the moving party must make a threshold showing that the nonmoving party’s claims are “based on” petitioning activities alone and have no substantial basis other than or in addition to those activities. Id. Once the moving party meets its burden, the burden shifts to the nonmoving party to “show by a preponderance of the evidence that the petitioning activity was ‘devoid of any reasonable factual support or any arguable basis in law and [that] the moving party’s acts caused the actual injury.’" Id. at 254-55, quoting G.L.c. 231, §59H. If the nonmoving party fails to meet this two-pronged test, the claims must be dismissed. Office One, Inc. v. Lopez, 437 Mass. 113, 120 (2002). Put differently, the nonmoving party “must show that no reasonable person could conclude that there was [a basis in law] for requesting that review.” Baker v. Parsons, 434 Mass. 543, 554 (2001). Upon dismissal, the moving party shall be entitled to an award of costs and reasonable attorneys fees. G.L.c. 231, §59H (1994 ed.). In ruling on a motion to dismiss under the anti-SLAPP statute, a judge “shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.” G.L.c. 231, §59H.
Harding has met her burden of demonstrating that the plaintiffs’ claims are based on her petitioning activities. As the plaintiffs allege, Harding petitioned various members of the City Defendants to oppose the Project by forming the Coalition, voicing her opposition to the Project to the BRA and ISD, writing letters to the Boston Globe and Roxbury Banner, and writing letters to various individuals and agencies, including Mayor Thomas Menino, Senator Diane Wilkerson, and the Zoning Board of Appeals. These allegations merely amount to the innocuous claim that Harding was exercising her right of free speech.
The plaintiffs, however, have failed to meet their burden of demonstrating a claim based in something other than, or in addition to, Harding’s petitioning activities. The plaintiffs attempt to make a factual showing of conspiracy to unlawfully discriminate on the basis of race by pointing to the letter Harding wrote to the Boston Globe that she would like to keep the neighborhood “comfortable, middle class and black,” and that Harding, in a community meeting, may have implied that she opposed the plaintiffs because of Fromm’s race. The plaintiffs unpersuasively attempt to demonstrate a conspiracy by linking these facts to the fact that the BRA and ISD were aware of her negative views toward the Project.
Harding’s activities are governed by the letter ánd purpose of G.L.c. 231, §59H. Harding was seeking redress from the City of Boston, through review and further consideration of the Project, for her own grievance and on her own behalf. Her Coalition was merely a group of concerned citizens with a stake in the land development activities of their neighborhood, as changes in the aesthetics, traffic flow, and population density of an area affect property value. Cf. Kobrin v. Gastfriend, 443 Mass. 327, 330 (2005) (holding that an expert witness’ affidavit submitted pursuant to a criminal proceeding is not the type of petitioning activity that the statute seeks to protect). Harding’s activities, including meeting with local officials and agencies to reconsider the Project and writing to local papers and relevant individuals and agencies, constituted exactly the type of activity that the anti-SLAPP statute seeks to protect. Further, the fact that she wrote to a local paper that she and the Coalition drafted “suggested guidelines” for developers is merely an exercise of her constitutionally protected right of free speech. As the plaintiffs admit in the complaint, they have no obligation whatsoever to comply with her suggestions. In support of the plaintiffs’ conspiracy *494 theory, the plaintiffs point to the fact that upon a public review of documents at the BRA, Fromm found newspaper clippings regarding the Project, including Harding’s letter to the editor of the Roxbury Banner. The plaintiffs concede that these articles were kept in the ordinary course of business.
Because traffic congestion and increased population as a result of twenty-two new condominium units can have a significant affect on property value, Harding’s opposition to the Project was not without a factual basis. The plaintiffs have failed to show that no reasonable person could conclude that there was a basis in law for requesting review and further consideration of the Project. See Baker, 434 Mass, at 554. Given that the plaintiffs have failed to meet their burden on the first element, the Court need not reach the second element of actual injury.

B. Motion to Dismiss Pursuant to Mass.R.Civ.P. 12(b)(6)

Even if the plaintiffs could effectively demonstrate that Harding’s petitioning activities lacked any factual support, the plaintiffs’ claims against her would still fail for failure to state a claim upon which relief can be granted. The Court addresses each of these claims against Harding as alternative grounds for dismissal.

1.Standard of Law

A motion to dismiss should be granted when a party fails to state a claim upon which relief may be granted. Mass.RCiv.P. 12(b)(6). In deciding a motion brought pursuant to Rule 12(b)(6), the Court must accept as true the complaint’s well-pleaded factual allegations and any allegations and any reasonable inferences in the defendant’s favor that may be drawn from those allegations. Fairneny v. Savogran Co., 422 Mass. 469, 470 (1996). The complaint should not be dismissed “unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

2.42 U.S.C. §§1983 and 1988

The plaintiffs allege that Harding violated their right to procedural due process pursuant to 42 U.S.C. §§1983 and 1988. Section 1983 provides a remedy solely against “state actors,” not those acting in their individual capacity.[7] Section 1988 provides for the recovery of attorneys fees for parties prevailing under §1983 or §1985; thus, any claim failing under either of these sections must also fail under §1988. It is undisputed that Harding is a private citizen. Allegations or insinuations by the plaintiffs that Harding acted in concert with the BRA and thus was acting under the color of law are unpersuasive, as they are unsupported by any factual basis. The Court cannot sidestep the fact that Harding is not a state actor, and under no reasonable inference may the Court conclude that Harding was acting under the color of law in her petitioning activities. Thus, the plaintiffs’ claim against Harding under 42 U.S.C. §1983, and accordingly, under §1988, fails on this ground.
3.42 U.S.C. §§1985 and 1988
To proceed with a claim under §1985, the plaintiffs must allege that Harding (1) conspired (2) for the purpose of depriving, the plaintiffs’ equal protection of the laws, or of equal privileges and immunities under the laws, and (3) committed an overt act in furtherance of the conspiracy, which (4) resulted in either injuiy to the plaintiffs or a deprivation of a constitutionally protected right or privilege. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). The plaintiffs’ claim must fail for want of a conspiracy.
The plaintiffs would like the Court to infer that because Harding met with city officials to express her concerns over the Project, there was a conspiracy between Harding and the BRA and/or other city authorities. The only facts the plaintiffs allege on this point are that Harding voiced her opposition to members of the BRA and ISD; that Fromm is white; and that Harding wrote to the Boston Globe that she would like to keep the neighborhood “comfortable, middle class and black.” Harding’s meetings and/or communications with local government officials fall within her right to petition the government for redress, and a single quote from a newspaper article does not demonstrate a conspiracy. The Court cannot reasonably infer from these few and flimsy facts a conspiracy to discriminate. Accordingly, the plaintiffs’ claim under 42 U.S.C. §1985, and consequently §1988, must fail. See Daddarie v. Cape Cod Comm’n, 56 Mass.App.Ct. 764, 773 (2002) (conclusory allegations are insufficient to survive a motion to dismiss without well-pleaded facts demonstrating the grounds upon which the claim rests).

4.MCRA

The plaintiffs further assert civil rights violations against Harding, pursuant to the MCRA. The MCRA provides a remedy to individuals whose constitutional rights have been interfered or attempted to be interfered with by threats, intimidation, or coercion.[8] G.L.c. 12, §§11H and 111; see Bally v. Northeastern University, 403 Mass. 713, 718 (1989).
Generally, “threat, intimidation or coercion” refers to a threat of imminent harm, coupled with a physical confrontation, or a loss of a contract right. See Willitts v. Roman Catholic Archbishop, 411 Mass. 202, 210 (1991). The only fact the plaintiffs allege in support of this claim is Jemison and Fromm’s conversation in which Jemison “responded by threatening Fromm and admonishing him not to ‘make any waves’ or ‘rock the boat’ in any way if he ever wanted to see the BRA approve [Keith Realty’s] design review.”
The Court cannot reasonably draw the inference that this was a threat, or more importantly, that Harding should be liable for it. First, even if the Court assumes that in the plaintiffs’ bifurcated allegation that the statements were actual threats and not mere *495 admonishments, there was no physical confrontation. The altercation took place over the telephone; mere words a threat does not make for purposes of the MCRA. See Smith v. City of Boston, No. 03-10062-DPW (D.Mass. July 2004). Second, the alleged threat was by Jemison, and if spoken on behalf of any individual or group, it was the BRA, not Harding.
The plaintiffs have improperly swept Harding into the net of claims cast against all twenty original defendants, regardless of applicability. Harding has no relationship, agency or otherwise, to Jemison or the BRA to be liable for his statements. Any allegation that Harding is an agent of the BRA or Jemison is without factual support. Accordingly, the plaintiffs’ MCRA claim must fail as well for insufficient facts demonstrating threats, intimidation or coercion. See Smith v. City of Boston, No. 03-10062-DPW (D.Mass. July 2004) (“adverse administrative action, such as the denial of a building permit, does not rise to the level of threat, at least when not part of a larger scheme of harassment” in the area of MCRA claims).
5. Negligent Infliction of Emotional Distress
The plaintiffs last assert a claim for negligent infliction of emotional distress against Harding. As in any negligence claim, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff. See Ulwick v. DeChristopher, 411 Mass. 401 (1991). One owes a duty of care to all foreseeable victims. Limone v. United States, 336 F.Sup.2d 18, 42 (D.Mass. 2004). Here, while the plaintiffs were the indirect targets of Harding’s opposition to the Project, they were not foreseeable victims. Harding is a private citizen, who was voicing her opinion under her rights of free speech and petition. To hold her liable under negligence theory solely for these activities would effectively squash her constitutional right of free speech.

II. City Defendants’ Motion to Dismiss Pursuant to Mass.R.Civ.P. 12(b)(6)

A. Standard of Review

The plaintiffs assert that the City Defendants’ motion to dismiss should be converted into a motion for summary judgment because of reference to the prior mandamus action, and administrative and Superior Court decisions on this case. As a general rule, a court may not consider documents outside of the pleadings without converting a motion to dismiss into one for summary judgment. Watterson v. Page, 987 F.2d 3 (1st Cir. 1993). Exceptions to this rule exist, however, “for documents the authenticity of which are not disputed by the parties; for official records; for documents central to plaintiffs’ claim; or for documents sufficiently referred to in the complaint.” Id.
Here, the plaintiffs refer to the mandamus action; the other actions that follow are matters of official record, the authenticity of which the plaintiffs do not dispute and of which the plaintiffs have notice. See id., quoting Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992) (“ ‘[T]he problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff . . . Where [the] plaintiff has actual notice . . . and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.’ ”). Thus, the fact that the Court considers these references as part of the plaintiffs’ allegations does not convert the instant motion to one for summary judgment. Accordingly, the Court considers whether there is any set of facts in the complaint under which the plaintiffs may be entitled to relief. '

B. Res Judicata

The plaintiffs bring a multitude of civil rights claims against the City Defendants, grounded in both federal lawpursuantto 42 U.S.C. §§1983, 1985, and 1988, and state law pursuant to the MCRA as a result of the City Defendants’ alleged unlawful denial of building permits for the Project. The City Defendants counter that these claims must necessarily fail on grounds of res judicata.
The courts have routinely held that the doctrine of res judicata applies to civil rights actions. Cinelli v. City of Revere, 820 F.2d 474, 479 (1st Cir. 1987); Isaac v. Schwartz, 706 F.2d 15, 16 (1st Cir. 1983). Under res judicata, the defendant bears the burden of establishing that a prior cause of action was; (1) between the same parties, or parties in privity; (2) of the same subject matter; and (3) decided adversely to the party seeking to litigate the subject matter again. Fabrizio v. U.S. Suzuki Motor Corp., 362 Mass. 873, 873 (1972). Minor changes in the facts are irrelevant; a court need only look at whether the new action arises out of the same act or transaction and seeks redress for the same wrong. Isaac, 706 F.2d at 17, citing Mackintosh v. Chambers, 285 Mass. 594, 596 (1934). Thus, the issue is “not whether the plaintiff in fact argued his [civil rights] claims [in the first proceeding], but whether he could have.” Id., quoting Lovely v. Laliberte, 498 F.2d 1261, 1263 (1st Cir. 1974).
In the instant action, the plaintiffs assert new legal theories for redress against the same wrongs as in their previously litigated mandamus action. In both complaints, the underlying act is the same. All of the operative events underlying the plaintiffs’ present complaint had occurred by the time of the mandamus action. In the mandamus action, Keith Realty alleged that the City of Boston and the ISD had effectively engaged in a regulatory taking of Keith Realty’s property and demanded mandamus relief. In that action, the Superior Court (Connor, J.) dismissed both Keith Realty’s takings claim and request for mandamus relief.
In addition, there was privity between the parties. While Fromm was not a party in the mandamus action, as the president and principal of the plaintiff Keith Realty, and the individual behind the litigation, he was in privity with Keith Realty in the first action. See In re Belmont Realty Corp., 11 F.3d 1092, 1097 (1st Cir. *496 1993) (in a res judicata action, privity existed between a closely-held corporation and its officer/shareholder who participated extensively in the prior action proceedings). The City Defendants in the instant action, too, were all either present in the mandamus action or in privity with the defendants in that case.[9] See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-03 (1940) (for purposes of res judicata, a government and its officers are in privity with one another).
The first complaint alleged that the BRA unlawfully delayed the plaintiffs’ design review process; that the ISD unlawfully denied the plaintiffs’ application for building permits; that the delay constituted a regulatory taking; and that the plaintiffs suffered damages as a result. The instant complaint alleges essentially these same facts. Additional facts alleged in the instant complaint regarding Harding arid in support of the plaintiffs’ conspiracy theory is from the same nucleus of operative fact; specifically, that the plaintiffs were unlawfully denied building permits. The plaintiffs now claim a denial of procedural due process, conspiracy to discriminate, and a violation of civil rights guaranteed under the MCRA. If the plaintiffs wished to assert these additional theories, they should have done so during the state mandamus action. Principles of res judicata bar these claims from going forward against the City Defendants. As such, the Court need not address the City Defendants’ alternative collateral estoppel grounds or failure to state a viable claim under 42 U.S.C. §§1983 or 1985, or the MCRA.

ORDER

For the foregoing reasons, it is hereby ORDERED that:
(a) The defendant Harding’s special motion to dismiss pursuant to G.L.c. 231, §59H is ALLOWED, and to the extent that the statute imposes assessment of costs and reasonable attorneys fees, hearing on that issue is reserved for the judge now sitting in the Suffolk Superior Court Civil F Session;
(b) To the extent that the defendant Harding seeks alternative grounds for dismissal pursuant to Mass.R.Civ.P. 12(b)(6), the motion is ALLOWED; and
(c) The City Defendants’ motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) is ALLOWED.

The term “City Defendants” refers to the following: Michael Kineavy, individually and as Director of the Mayor’s Office of Neighborhood Services; Derek Small, individually and as Special Assistant in the Mayor’s Office of Neighborhood Services; Inspectional Services Department of the City of Boston; Kevin J. Joyce, individually and as Commissioner of Inspectional Services Department of the City of Boston; Gary P. Moccia, individually and as Designated Building Official of Inspectional Services Department of the City of Boston; City of Boston.

On May 23, 2002, Keith Realty filed a notice of voluntary dismissal, without prejudice, as to the BRA.

The acronym “SLAPP” stands for Strategic Lawsuit Against Public Participation.

Ihe anti-SLAPP statute broadly defines petitioning activities as: “Any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition the government.” G.L.c. 231, §59H (1994 ed.) (emphasis added).

In relevant part, 42 U.S.C. §1983 states, “Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .”

The MCRA provides, in relevant part, “Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action . . .” G.L.c. 12, §11H (1990 ed.) (incorporated into G.L.c. 12, §111).

Parties in identity between this action and the mandamus action are: the City of Boston; the ISD; and Kevin J. Joyce, as Commissioner of the ISD. Parties in privity between this action and the mandamus action include all of the remaining six City Defendants, who share a mutuality of interest with the aforementioned City Defendants: Garry P. Moccia, Designated Building Official of the ISD; Michael Kineavy, Director of the Mayor’s Office of Neighborhood Services; Derek Small, Special Assistant in the Mayor’s Office of Neighborhood Services.